David H. MARION, as receiver
for Bentley Financial
Services, Inc.

v.

TDI INC, (f/k/a Traders and Dealers, Incorporated, f/k/a TDI, Incorporated, f/k/a The Trading Desk, Inc. and f/k/a U.S. Central Securities, Inc.); Southeastern Securities Inc.; SFG Financial Services, Inc.; Peninsula Bank; Theodore Benghiat; Casto Edwin Rivera; Jerry Manning; John Strine; Jeffrey Wilson; Joseph Marzouca

v.

Sanford Goldfine; S.D. Goldfine & Co.; (Third–Party Defendants) (D.C. No. 02–cv–07032)

David H. Marion, as receiver
for Bentley Financial
Services, Inc.

v.

S.D. Goldfine & Company; Sanford Goldfine; Jeffrey Wilson; Jerry Manning; Joseph Marzouca; Theodore Benghiat; Peninsula Bank; Casto Edwin Rivera; SFG Financial Services, Inc.; Southeastern Securities, Inc.; John Strine; The Trading Desk, Inc. d/b/a TDI, Inc.; (D.C. No. 02–cv–07076)

Peninsula Bank; Joseph Marzouca,
Appellants (No. 06–5173)

David H. Marion, as receiver
for Bentley Financial
Services, Inc.

v.

TDI Inc., (f/k/a Traders and Dealers, Incorporated, f/k/a TDI, Incorporated, f/k/a The Trading Desk, Inc. and f/k/a U.S. Central Securities, Inc.); Southeastern Securities Inc.; SFG Financial Services, Inc.; Peninsula Bank; Theodore Benghiat; Casto Edwin Rivera; Jerry Manning; John Strine; Jeffrey Wilson; Joseph Marzouca

v.

Sanford Goldfine; S.D. Goldfine & Co.; (Third–Party Defendants) (D.C. No. 02–cv–07032)

David H. Marion, as receiver
for Bentley Financial
Services, Inc.

v.

S.D. Goldfine & Company; Sanford Goldfine; Jeffrey Wilson; Jerry Manning; Joseph Marzouca; Theodore Benghiat; Jerry Manning; Joseph Marzouca; Peninsula Bank; Casto Edwin Rivera; SFG Financial Services, Inc.; Southeastern Securities, Inc.; John Strine; The Trading Desk, Inc. d/b/a TDI, Inc.; (D.C. No. 02–cv–07076)

Southeastern Securities, Inc.; SFG Financial Services, Inc.; Theodore Benghiat, Appellants (No. 06–5196)

David H. Marion, as receiver for Bentley Financial Services, Inc., Appellant (No. 07–1010)

v.

TDI Inc., (f/k/a Traders and Dealers, Incorporated, f/k/a TDI, Incorporated, f/k/a The Trading Desk, Inc. and f/k/a U.S. Central Securities, Inc.); Southeastern Securities Inc.; SFG Financial Services, Inc.; Peninsula Bank; Theodore Benghiat; Casto Edwin Rivera; Jerry Manning; John Strine; Jeffrey Wilson; Joseph Marzouca

v.

Sanford Goldfine; S.D. Goldfine & Co.; (Third–Party Defendants) (D.C. No. 02–cv–07032)

David H. Marion, as receiver
for Bentley Financial
Services, Inc.

v.

S.D. Goldfine & Company; Sanford Goldfine; Jeffrey Wilson; Jerry Manning; Joseph Marzouca; Theodore Benghiat; Jerry Manning; Joseph Marzouca; Peninsula Bank; Casto Edwin Rivera; SFG Financial Services, Inc.; Southeastern Securities, Inc.; John Strine; The Trading Desk, Inc. d/b/a TDI, Inc.; (D.C. No. 02–cv–07076)

David H. Marion, as receiver
for Bentley Financial
Services, Inc.

v.

TDI Inc., (f/k/a Traders and Dealers, Incorporated, f/k/a TDI, Incorporated, f/k/a The Trading Desk, Inc. and f/k/a U.S. Central Securities, Inc.); Southeastern Securities Inc.; SFG Financial Services, Inc.; Peninsula Bank; Theodore Benghiat; Casto Edwin Rivera; Jerry Manning; John Strine; Jeffrey Wilson; Joseph Marzouca

v.

Sanford Goldfine; S.D. Goldfine & Co.; (Third–Party Defendants) (D.C. No. 02–cv–07032)

David H. Marion, as receiver
for Bentley Financial
Services, Inc.

v.

S.D. Goldfine & Company; Sanford Goldfine; Jeffrey Wilson; Jerry Manning; Joseph Marzouca; Theodore Benghiat; Peninsula Bank; Casto Edwin Rivera; SFG Financial Services, Inc.; Southeastern Securities, Inc.; John Strine; The Trading Desk, Inc. d/b/a TDI, Inc.; (D.C. No. 02–cv–07076)

Peninsula Bank; Joseph Marzouca, Appellants (No. 07–3398)

David H. Marion, as receiver
for Bentley Financial
Services, Inc.

v.

TDI Inc., (f/k/a Traders and Dealers, Incorporated, f/k/a TDI, Incorporated, f/k/a The Trading Desk, Inc. and f/k/a U.S. Central Securities, Inc.); South-

eastern Securities Inc.; SFG Financial Services, Inc.; Peninsula Bank; Theodore Benghiat; Casto Edwin Rivera; Jerry Manning; John Strine; Jeffrey Wilson; Joseph Marzouca

v.

Sanford Goldfine; S.D. Goldfine & Co.; (Third–Party Defendants) (D.C. No. 02–cv–07032)

David H. Marion, as receiver
for Bentley Financial
Services, Inc.

v.

S.D. Goldfine & Company; Sanford Goldfine; Jeffrey Wilson; Jerry Manning; Joseph Marzouca; Theodore Benghiat; Peninsula Bank; Casto Edwin Rivera; SFG Financial Services, Inc.; Southeastern Securities, Inc.; John Strine; The Trading Desk, Inc. d/b/a TDI, Inc.; (D.C. No. 02–cv–07076)

Southeastern Securities, Inc.; SFG Financial Services, Inc.; Theodore Benghiat, Appellants (No. 07–3416).

Nos. 06–5173, 06–5196, 07–1010, 07–3398, 07–3416.

United States Court of Appeals, Third Circuit.

Argued Dec. 1, 2008.

Opinion filed Jan. 4, 2010.

Eugene E. Stearns, Esquire (Argued), Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Miami, FL, Alan K. Cotler, Esquire, Reed Smith, Philadelphia, PA, for Appellants/Cross–Appellees, Peninsula Bank, Joseph Marzouca.

Laurence A. Mester, Esquire (Argued), Grossman Law Firm, Philadelphia, PA, for Appellant/Cross–Appellees, Southeastern Securities Inc., SFG Financial Services, Inc. Theordore Benghiat.

David D. Langfitt, Esquire, John H. Lewis, Jr., Esquire (Argued), Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Appellees/Cross Appellants, David H. Marion, Esquire.

Before: AMBRO, WEIS, and VAN ANTWERPEN, Circuit Judges.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

A receiver for a corporation through which a Ponzi scheme was run brought suit against various third-parties alleged to have assisted the scheme, ultimately winning a multimillion-dollar jury verdict. The receiver's theory of the case was that the defendants, in concert with the corporation's chief officer, had harmed the corporation by saddling it with additional liability to the scheme's victims. Following a verdict in the receiver's favor, the defen-

dants unsuccessfully moved for judgment as a matter of law, arguing, among other things, that the receiver lacked standing to bring the claims submitted to the jury and that the evidence was insufficient to support the jury's verdict. We agree with the receiver that, under our case law, he had standing to bring the claims presented to the jury. But we agree with the defendants that they cannot be liable to the corporation on the facts presented at trial. Accordingly, we vacate the District Court's denial of the defendants' post-trial motion for judgment of law and remand with instructions to enter judgment in their favor.

## I. Facts and Procedural History

### A. The Bentley Scheme

In 1986, Robert Bentley established Bentley Financial Services, Inc. ("BFS"), a Pennsylvania corporation, through which he brokered bank-issued certificates of deposit (CDs).[1] In 1993, Bentley formed the Entrust Group ("Entrust"), a Pennsylvania sole proprietorship, to act as custodian on BFS-brokered transactions. In the CD-selling industry, the broker is responsible for connecting CDs available for purchase from banks with particular investors. The custodian then collects the money from each investor, wires it to the issuing bank and holds onto the CD, while issuing a "safekeeping receipt" to the investor indicating that it has title to the CD held by the custodian.

The CD seller's profit (often called the "spread") comes from the difference between the terms of the CD purchased from the bank and the terms on which the CD is sold to the investor. In a simple case, a CD offered by a bank might provide a 5% interest rate on a two-year maturity, which the broker would then offer to the investor as a two-year CD at 4.5% interest, taking the interest-rate difference as profit.

A more complex, and risky, way a CD broker can profit is by mismatching maturity dates. In one form of maturity mismatching,[2] a broker locks in a particular interest rate for a long-term CD and then, rather than selling it as a long-term CD to an investor, sells it as a series of short-term CDs, hoping to profit from the difference between the market rate for interest in short-term CDs and the long-term rate the broker locked in.[3] However, if a purchaser of one of these short-term CDs wants the investment back at the end of the shortened maturity period (rather than rolling over the investment), the broker cannot simply get the principal back from the bank from whom the broker purchased the long-term CD. In those circumstances, the broker typically has three options: (1) find another investor for a new short-term CD and return the outgoing investor's principal from the proceeds of that sale; (2) "warehouse" the long-term CD with a cooperating bank that agrees to purchase the long-term CD temporarily until an investor for a new short-term CD can be found, thus allowing the broker to pay the outgoing investor out of the money loaned by the cooperating bank; or (3) require the investor to stay locked in to the long-term CD until its actual maturity date or

---

1. Robert Bentley established BFS with his brother David Bentley. Robert bought David out in 1993, well before the scheme began.

2. There are multiple forms of mismatching, many of which were used by Bentley as part of his scheme. We focus only on this form—the selling of shortened maturities—in order to provide a general idea of how Bentley's scheme worked. In this regard, unless the context requires otherwise, any reference to Bentley in this subsection A, and subsection B, includes as well BFS and Entrust.

3. The risk to the broker, of course, is that interest rates on short-term CDs will increase higher than the locked-in long-term rate.

until a substitute investor can be found to provide the money to pay the outgoing investor. This form of mismatching is legal as long as the mismatch is disclosed to the investor (including the fact that the investor may not be able to reclaim its principal at the maturity date stated in the investment contract).

Bentley's operation deviated from the standard business model described above in at least two crucial respects.[4] First, and most dramatically, in 1996 Bentley started selling fictitious CDs. As his own custodian, he could fool investors by issuing bogus safekeeping receipts. According to Bentley, the decision to sell fake CDs traced back to 1994 or 1995, when Entrust obtained a $2 million credit line, secured by commissions, for cash flow management. In an act that Bentley would later describe as rooted in impatience, he forged his accountant's signature in a letter certifying the collateral. The bank discovered the forgery in 1996 and called the balance on the credit line, threatening Bentley's business. To repay the loan, Bentley created and sold the fictitious CDs. Because Bentley used the proceeds of the sales to pay down the loan—rather than to purchase CDs that would generate interest while retaining the initial investment—he could only pay the investors the interest and principal owed on the fake CDs by obtaining money from new investors (money that, in turn, could not all be used to buy new CDs).

That was the birth of Bentley's Ponzi scheme.[5] His ability to meet his obli-gations to past investors depended on his ability to obtain money from new investors, forcing Bentley to continue the scheme or default.

Trying to escape the financial hole he was digging, Bentley pursued a strategy of aggressive maturity mismatching. He purchased long-term CDs, hoping that, if interest rates on short-term CDs went down, he could generate enough from the mismatch that he would no longer need to sell fictitious CDs to meet his obligations as they came due.

That led to a second way in which Bentley's enterprise deviated from an above-board CD brokerage operation. Because Bentley's customer base comprised primarily conservative investors such as credit unions, he failed to disclose the mismatching.[6] Thus, investors who purchased mismatched short-term CDs did not know they were actually purchasing interests in long-term CDs. If such an investor wanted its principal back at the end of the stated (that is, shortened) maturity date, Bentley could not force the investor to stay with the long-term CD without revealing its true nature. Instead, he quickly had to find some way to generate the cash necessary to return the principal, often (when he guessed wrong about the direction of interest rates) by selling another mismatched short-term CD to a new investor at a higher rate of interest than the one he initially got from the bank on the long-term CD.

Thus, though Bentley was in fact purchasing CDs—rather than simply recy-

**4.** As indicated already, the account that follows simplifies Bentley's scheme.

**5.** A "Ponzi scheme" gets its name from Charles Ponzi, who was infamous in the early part of the 20th Century for devising a scam operation that paid returns to investors not from the profits earned on investments but from monies paid by later investors.

**6.** The risk to the investor who purchases a CD with a shortened maturity backed by a CD with a longer maturity is that it might not be able to get the principal out on the shortened maturity date.

cling, or embezzling, the money he obtained from investors—his scheme still embodied some of the classic features of a Ponzi. In many cases, investors were not purchasing what they thought they were purchasing. Either (as in the case of the fictitious CDs) there was no underlying CD, or (as in the case of the CDs used as part of Bentley's mismatching strategy) the terms of the underlying CD did not match what had been disclosed to the investor. And Bentley's ability to make good on his obligations to his investors depended in significant part on his finding new investors.

## B. Benghiat and Marzouca

This appeal centers on the relationship between Bentley's scheme and two figures who would later become defendants in this case—Ted Benghiat and Joseph Marzouca. Benghiat owned two Florida firms—(1) SFG Financial, Inc. ("SFG"), a CD broker with whom BFS frequently served as a co-broker (with SFG acting as the "wholesale broker," locating available CDs from banks, and BFS acting as the "retail broker," connecting those CDs to particular clients); and (2) Southeastern Securities, Inc. ("SSI"), a securities firm. Marzouca was Vice–President of Peninsula Bank, a Florida bank that had an ongoing relationship with SFG as a warehouser of its CDs, and that later served as a custodian (along with Entrust) on a number of BFS's sales. When Peninsula Bank and Entrust worked together as custodians, Peninsula Bank acted as the "superior custodian," while Entrust acted as the "sub-custodian." That means that Peninsula Bank would purchase the CD from the bank and hold it, while issuing a safekeeping receipt to Entrust, which would then issue a separate

safekeeping receipt to the investor. Graphically depicted, the relationship between the issuing banks, SFG, Peninsula Bank and Bentley's two firms (BFS and Entrust) went as follows:

| Banks | |
|---|---|
| (CD Issuers) | |
| SFG (Benghiat) (Wholesale Broker) | Peninsula Bank (Marzouca) (Superior Custodian) |
| BFS (Bentley) (Retail Broker) | Entrust (Bentley) (Sub–Custodian) |

The primary issue in dispute at trial was whether, and to what extent, Benghiat and Marzouca knew about Bentley's scheme. Bentley testified that Benghiat knew Bentley was mismatching maturities without telling his investors and had urged him to disclose it (he did not), but Bentley did not claim to have told either Benghiat or Marzouca directly about his sale of fake CDs. What is undisputed is that (knowingly or not) Benghiat and Marzouca helped the scheme stay afloat in at least two ways. First, Bentley's investors would sometimes call issuing banks listed on their safekeeping receipts to confirm that the banks really issued the CDs. Because the banks only knew the identities of the superior custodians to which they issued the CDs, they referred questions to Marzouca at Peninsula Bank. He forwarded them to Benghiat, who called Bentley with the names of curious investors. Bentley would then cash the investors out immediately, waiving any penalty associated with early withdrawal, to avoid further questions.

Second, on three occasions Benghiat and Marzouca helped Bentley obtain the cash necessary to keep Bentley's operation afloat. The first of these occasions took place in late 1999. Investors spooked by rumors of a Y2K computer bug[7] refused

---

7. This refers to what, in the period running up to the turn of the millennium, was feared to be a glitch in computer record-keeping

where, because of the practice of abbreviating four-digit years to two digits for data-entry

to roll over their short-term CDs, forcing Bentley to return $138 million in principal. Rates on short-term CDs were rising, souring his gamble on long-term CDs and forcing him to pay higher rates to attract money. Bentley raised most of the cash he needed by finding new investors and liquidating between $5 million and $20 million of his risky long-term CDs on the open market. But he also turned to Benghiat for help.

Benghiat spoke with Marzouca, and together the three parties engineered what they styled as a "warehousing" transaction between Bentley's operation and Peninsula Bank.[8] Under the arrangement, Peninsula Bank agreed to purchase temporarily up to $10 million in CDs from Bentley in exchange for (1) a non-refundable $100,000 fee to be split between Marzouca and Benghiat, (2) interest on the CDs plus any shortfall between such interest and the prevailing prime rate of interest, and (3) a $1 million security deposit from Entrust intended to cover the difference (if any) between the purchase price of the CDs and the amount for which Peninsula Bank resold them. The deposit was subject to forfeiture if the Bank failed to sell all the CDs within 120 days. Bentley sold $6.8 million in CDs to Peninsula Bank under this arrangement in October and November 1999, repurchasing them within 120 days at a total loss in fees and interest of approximately $300,000. Two more warehousing transactions at virtually the same terms followed in 2000 and 2001.

Finally, Bentley had a side business brokering securities, such as bonds. For about 18 months starting at the end of 1998, he brokered securities for SSI (Benghiat's firm) on a commission basis. Because of this relationship, the National Association of Securities Dealers (NASD), of which SSI was a member, required SSI to supervise Bentley's operation. But, based on legal advice it received, SSI concluded that it was not responsible for Bentley's CD business because the Securities and Exchange Commission does not regulate CDs. Benghiat therefore limited SSI's supervision to the (much smaller) non-CD aspects of Bentley's operation. When lawyers for SSI started to worry that the SEC would regulate CDs, SSI (through Benghiat) terminated Bentley in August 2000, citing Bentley's "other activities."

In September 2001, a Texas bank that had purchased fake CDs from Bentley tried to confirm its ownership. As usual, Marzouca forwarded the request through Benghiat to Bentley, who ultimately bought back the fake CDs from the Texas bank after acquiring $7.5 million from Peninsula Bank (in the final of the three warehousing transactions) to do it. But the Texas bank alerted regulators, and, shortly thereafter, the scheme was exposed. Bentley later pled guilty to one count of mail fraud for selling worthless certificates of deposit and one count of bribery (relating to an aspect of the scheme not at issue in this appeal). He was sentenced to 55 months' imprisonment and ordered to pay $38 million in restitution.

## C. The Civil Proceedings

In October 2001, the SEC filed a civil action against Bentley, BFS and Entrust (collectively, the "Bentley defendants") in the Eastern District of Pennsylvania. In November 2001, the District Court appointed David H. Marion as receiver for the Bentley defendants pursuant to 28

purposes, information would be lost in the transition from 1999 to 2000.

8. Whether this transaction, and the similar ones that followed, should be characterized as a "loan," rather than a "sale", was subject to much dispute at trial. We take no position.

U.S.C. § 754, giving him "complete jurisdiction over, and control of all the property, real, personal or mixed, . . . wherever located[,] of [Bentley, BFS, and Entrust]." In August 2002, Marion brought an action (on behalf of BFS only) against, among others, Benghiat, SFG and SSI (collectively referred to hereinafter as "Benghiat") and Marzouca and Peninsula Bank (collectively referred to hereinafter as "Marzouca").[9] As amended, the complaint characterized the action as one "to recover damages from defendants for injuries, losses, obligations and liabilities suffered by and imposed upon [BFS] as a result of, *inter alia,* a fraudulent scheme orchestrated by [Bentley], and others (including the defendants)." The complaint alleged that the defendants had allowed the scheme to succeed "for as long as it did" by, among other things, failing properly to supervise Bentley in the face of a duty to do so, and "infus[ing] the Bentley scheme with additional cash despite knowledge of the precarious financial condition of BFS and its inability to honor its investment contracts."

The case was tried in June 2006. On the claims presented to the jury, there were three separate bases for finding liability. The jury could find that, in arranging the three warehousing transactions with Bentley, Benghiat and Marzouca had either (1) aided and abetted, or (2) conspired in, Bentley's fraud.[10] Or (3) the jury could find (with respect to Benghiat only) that he was liable for Bentley's fraud under a *respondeat superior* theory for failing to exercise adequate supervision during the period in which Bentley sold securities for SSI.

In addition, Marion submitted three separate measures of damages to the jury. The first, which came to $32,774,330, corresponded to the sums owed on the "new money" invested in the scheme after August 6, 1999 (when Bentley first enlisted the aid of Benghiat and Marzouca). The second measure, which came to $31,414,979, corresponded to BFS's total insolvency (the difference between its assets and its liabilities) as of October 23, 2001, the day before the receiver was appointed. The final measure corresponded to the amount by which BFS's insolvency increased between August 6, 1999 and October 23, 2001.

The jury found both Benghiat and Marzouca liable.[11] It assigned damages in the amount of $13,109,732 to Marzouca and $19,664,598 to Benghiat, sums that, when added up, equal the $32,774,330 under the first measure of damages listed above (the "new money" damages).

Benghiat and Marzouca moved for judgment as a matter of law, arguing both that Marion lacked standing to bring the claims

---

9. In addition to this action against Benghiat and Marzouca, various BFS investors later filed an action against them in Pennsylvania state court. In a letter accompanying the writ of summons served on Benghiat and Marzouca in that case, the plaintiffs explained that "we have filed this action as a protective measure in the event the Receiver's claims are dismissed for lack of standing. Assuming resolution of the Receiver's lawsuits fully addresses the pertinent issues, we would have no reason to ever file a Complaint. . . ."

10. It was explained that, to find Benghiat and Marzouca liable on either the aiding and abet-

ting claim or the conspiracy claim, the jury had to find that they were aware of Bentley's scheme when they arranged the different warehousing transactions.

11. The precise ground on which the jury found the defendants liable was not specified. The interrogatory submitted to the jury simply asked (for Benghiat and Marzouca separately) whether each had "conspired with or aided and assisted Robert Bentley in his fraudulent activities." No separate interrogatory was provided for the *respondeat superior* claim, nor were the conspiracy and aiding and abetting claims distinguished.

presented to the jury and that, at any rate, the evidence did not support the verdict.[12] Marion moved to mold the verdict to reflect joint and several liability. The District Court denied all the parties' motions. Benghiat and Marzouca later moved for relief from judgment, after discovering that Marion purportedly had prevented one of his experts from stating his opinion that there were no damages in the case. The Court denied that motion as well, and both parties appeal from the denial of their various post-trial motions.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 15 U.S.C. §§ 77v(a) & 78aa over Marion's claims against Benghiat and Marzouca because those claims were ancillary to a suit obtaining judgment against the Bentley defendants under federal securities law. *See Pope v. Louisville, New Albany & Chicago R.R.*, 173 U.S. 573, 577, 19 S.Ct. 500, 43 L.Ed. 814 (1899); *Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir.2008). We have jurisdiction under 28 U.S.C. § 1291.

■■■■ We review a District Court's "denial of judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the prevailing party." *Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 211 (3d Cir.2009) (*quoting Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir.2006) (internal quotation marks omitted). For Benghiat and Mar-

zouca's challenge to Marion's standing, we review the District Court's legal conclusions *de novo*, "but review for clear error the factual elements underlying the District Court's determination of standing.") *Gen. Instrument Corp. v. Nu–Tek Elecs. & Mfg.*, 197 F.3d 83, 86 (3d Cir.1999). For Benghiat and Marzouca's challenge to the sufficiency of the evidence against them, we "may grant ... judgment as a matter of law contrary to the verdict only if 'the record is critically deficient of the minimum quantum of evidence' to sustain the verdict." *Acumed*, 561 F.3d at 211 (quoting *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir.1995)).

## III. Discussion

Benghiat and Marzouca challenge the jury's verdict against them on multiple grounds, including whether Marion had standing to bring the claims on which they were found liable and whether the evidence was sufficient to support the verdict against them. Our case law requires that we side with Marion on the standing issue, but we agree with Benghiat and Marzouca that neither can be liable to Marion (as BFS's receiver) for the actions over which the jury passed judgment.[13]

## A. Standing

To begin, we must confront Benghiat and Marzouca's argument that Marion lacked standing to bring the claims presented to the jury. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95,

---

12. Benghiat and Marzouca also argued that the doctrine of *in pari delicto* (that a plaintiff cannot recover for damages from a defendant when the plaintiff is partly at fault) barred Marion, as a receiver stepping into BFS's shoes, from recovering for harm caused by Bentley's scheme.

13. In challenging the sufficiency of the evidence against them, Benghiat and Marzouca

focus particular attention on the argument that the evidence was insufficient to show that they had knowledge of Bentley's scheme when they (allegedly) contributed to it. Because we believe that their contributions to Bentley's scheme, even if knowing, could not give rise to liability to BFS (transferred to Marion standing in BFS's shoes), we do not reach that issue.

118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (explaining that the issue of standing, because it implicates a federal court's authority to hear a case, must be addressed as a threshold matter). Benghiat and Marzouca argue that Marion lacked standing because the injuries for which he sought compensation were those of the investors victimized by Bentley's scheme, not BFS. Marion concedes that, acting as the receiver for BFS, he could only bring suit to address injuries to BFS. Marion's Br. at 42–43. His argument is that, appearances to the contrary, the harm over which he asked the jury to pass judgment was to BFS.

Intuitively, Benghiat and Marzouca seem correct. That is, this action certainly has the look and feel of an effort to avoid the general rule that an "equity receiver may sue only to redress injuries to the entity in receivership." *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir.1995) (Posner, J.,); *see also Donell*, 533 F.3d at 777; *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir.2008); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 627 (6th Cir.2003); *Fla. Dep't of Ins. v. Chase Bank of Tex., N.A.*, 274 F.3d 924, 931 (5th Cir.2001); *Goodman v. FCC*, 182 F.3d 987, 991–92 (D.C.Cir.1999); *Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 25 (1st Cir.1990). That is the impression left by some of the remarks made by Marion's counsel to the jury over the course of the trial.

In his opening statement at trial, Marion's attorney asserted that "the purpose of this ... case is to obtain a verdict so that all the victims of the Bentley scheme can be paid what they [are] owed." In that same statement, he described Marion's job as a receiver as being "to help the victims of the scheme" by first "collect[ing] the money" still existing in the scheme, and then "investigat[ing] ... to see if claims should be made against all those who worked with [Bentley] so that all the obligations to the victims can be paid." In asking the jury for damages in his closing argument, Marion's counsel contended that "[f]undamental fairness requires that at a minimum the investors get back the full amount of their principal and the interest they were promised," and described the measure of damages ultimately awarded— the "new money" damages—as "what the receiver needs in order to repay the investors what they are owed."

Marion retorts that more important than these remarks was the District Judge's actual jury charge, to wit:

The receiver has an obligation to take over the assets of the business ..., and also is empowered to collect any monies that might be due the businesses.

The lawsuit is an attempt by the receiver to collect money which the receiver claims should be paid to the receivership as due the receivership because of the implication of the defendants in some of Mr. Bentley's activities.

 In this context, we do not take the remarks of Marion's counsel as necessarily decisive for standing purposes.[14] More-

---

**14.** No doubt some of the remarks of Marion's counsel (especially those delivered in his closing argument) implied that the jury's task was to determine whether Benghiat and Marzouca caused the investors compensable injuries. That certainly supports the notion that Marion was really pursuing the claims of Bentley's victims. Yet, if there were a cognizable theory of injury underlying Marion's claims, and the problem was simply that his attorney mischaracterized those claims, the remedy would be to order a new trial (provided that the requisite level of prejudice was shown), not to dismiss the case for lack of standing. *See Forrest v. Beloit Corp.*, 424 F.3d 344, 351 (3d Cir.2005) (explaining that a new trial is warranted when counsel makes "improper statements" and it is "reasonably probable" that the "verdict was influenced by the resulting prejudice"). Because we believe the trial

over, it is undisputed that Marion was acting for the benefit of the investors (even though he lacked authority to bring claims directly on their behalf). *See Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 795 (6th Cir.2009) ("[T]he purpose of a receiver [is] to marshal the receivership entities' assets ... so that the assets may be distributed to the injured parties in a manner the court deems equitable."); *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir.1986) ("[A] primary purpose of equity receiverships is to promote orderly and efficient administration of the estate ... for the benefit of creditors."). As we have explained in the analogous bankruptcy context, it is irrelevant to the issue of standing that "a successfully prosecuted cause of action [will result in] an inflow of money to the estate that will immediately flow out again to repay creditors."[15] *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 348–49 (3d Cir.2001).

We thus turn to the heart of the standing issue—whether a distinct injury to BFS underlay Marion's claims. In his supplemental briefing before us, Marion describes his theory of liability as follows: Benghiat and Marzouca, through their ac-

tions (and, in Benghiat's case, omissions as well), allowed Bentley's scheme to continue, and this "damaged the responsible corporation (BFS) ... because ... it is inevitable in a Ponzi scheme that there will be obligations that the corporation is unable to pay when the scheme is exposed." Marion's Supp'l Br. at 2. In other words, the claim is that Benghiat and Marzouca helped Bentley, and that help harmed BFS because it caused BFS to enter into more losing investment contracts than it otherwise would have. That (according to Marion) is why it was appropriate for the damages awarded to compensate BFS to equal the money owed to investors who came on board after Benghiat and Marzouca's involvement—the harm to BFS was essentially the harm in taking on additional liability to the defrauded investors.[16]

This claim, if plausible (and for purposes of this opinion we assume it is), steps over the relatively low standing threshold. A receiver no doubt has standing to bring a suit on behalf of the debtor corporation against third parties who allegedly helped that corporation's management harm the corporation.[17] Though Bentley controlled BFS, its separate cor-

---

evidence was insufficient to support the verdict, we need not discuss this issue further.

**15.** A bankruptcy trustee lacks authority to bring a claim directly on behalf of the debtor's creditors. *See Caplin v. Marine Midland Trust Co.*, 406 U.S. 416, 421–34, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). Thus, the standing issue in the bankruptcy context is the same one we face here—determining to whom the claims being brought belong.

**16.** In denying Benghiat and Marzouca's posttrial motion for judgment as a matter of law, the District Court framed Marion's theory as follows: "Bentley ... breached his fiduciary duty to the corporation by subjecting it to liability for fraud, and [Benghiat and Marzouca] assisted him in doing so." *Marion v. TDI, Inc.*, Nos. 02–7032 & 02–7076, 2006 WL

3742747, at *2 (E.D.Pa. Dec. 14, 2006). The problem here is that an aiding and abetting a breach-of-fiduciary-duty claim was never presented to the jury. The only claims presented were for aiding and abetting, or conspiring in, Bentley's fraud, or otherwise assuming responsibility (in Benghiat's case) for the fraud on a *respondeat superior* theory.

**17.** Such a suit might, however, be vulnerable to the defense of *in pari delicto*, which embodies the idea "that a plaintiff wrongdoer cannot recover from a defendant wrongdoer." *In re: CitX Corp.*, 448 F.3d 672, 681 n. 12 (3d Cir.2006). However, the *in pari delicto* issue is separate from that of standing, which is what we deal with here. *See Lafferty*, 267 F.3d at 346 (explaining that "[a]n analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto* ").

porate form makes it possible under our precedent to allege that Bentley (and those who helped him) harmed BFS. *See Lafferty,* 267 F.3d at 348 ("In Pennsylvania, as in almost every other state, 'a corporation is a distinct and separate entity, irrespective of the persons who own all its stock.'" (quoting *Barium Steel Corp. v. Wiley,* 379 Pa. 38, 108 A.2d 336, 341 (1954))). We found standing to bring a suit with that basic structure in *Lafferty* (albeit in the bankruptcy context), *id.* at 346–354, and other courts have done so specifically in the receiver context. *See, e.g., Donell,* 533 F.3d at 777; *Scholes,* 56 F.3d at 753–54.

We confess to being less comfortable with what Marion's theory identifies as the actual harm to BFS—essentially the harm of being responsible for the injury caused in the first instance to the investors. That seems to eliminate the cogency of any distinction between harm to the debtor and harm to the creditors. Yet we recognize that Marion's theory of injury finds support in the law of our Court. In *Lafferty,* we held that a creditors' committee, acting on behalf of a corporation, had standing to bring suit against third-party professionals who had allegedly conspired with the corporation's management to prolong the Ponzi scheme operated through it. 267 F.3d at 346–54. We based standing on the notion that, under Pennsylvania law, the third-party defendants, by offering "professional opinions" that were alleged to have wrongfully helped the scheme evade detection, had injured the corporation by deepening its insolvent condition. *Id.* at 347.

*Thabault v. Chait,* 541 F.3d 512 (3d Cir. 2008), is even more helpful to Marion. There we held that a corporation suffered

injury "separate from an injury to its creditors" when allegedly negligent auditing allowed it to write insurance policies that it lacked the reserves to cover, a conclusion we based on the notion that "an increase in liabilities is a harm to the company." [18] *Id.* at 523; *see also id.* at 521 ("[T]he damages here are losses incurred on insurance policies that would not have been written but for [the auditor's] negligence."). That seems to be more or less the theory on which Marion proceeded—that Benghiat and Marzouca injured BFS because their actions led it to take on additional liability to the investors.

With our case law framing the context, we conclude that Marion sufficiently alleged an injury distinct to BFS (suffered at the hands of Benghiat and Marzouca) to get past the standing threshold. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (explaining that standing requires (1) a cognizable injury suffered by the plaintiff, that is (2) fairly traceable to the challenged actions of the defendant, and (3) redressable by a court). Probing Marion's theory any further would, we believe, take us into a discussion of the merits of his claims, something separate from the standing inquiry. *See Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal. . . .").

## B. The Merits

We turn to the merits directly, and here the outcome is less happy for Marion. There are two factual determinations that the jury could have made in finding both

---

18. *Thabault* does not appear to have addressed the issue of standing directly. Its discussion of what constitutes a distinct injury to the insurance company arose in the context

of considering a challenge to the damages awarded to the receiver for that company. *Id.* at 518–23.

Benghiat and Marzouca liable—(1) that Benghiat and Marzouca helped Bentley infuse cash into his operation knowing that the money would be used to keep the scheme afloat; and (2) (in Benghiat's case only) that he failed to exercise adequate supervision over Bentley's CD-brokerage operation during a time in which Bentley sold securities for SSI.[19]

Neither of those findings, however, could give rise to liability to Marion standing in BFS's shoes. In the case of the first finding, the requisite causal link between Benghiat and Marzouca's actions and the harm BFS allegedly suffered (*i.e.*, economic loss) is missing. In the case of the second finding, the relevant breach of a duty would have been to the investors, not BFS. Thus, in neither case is the verdict supported by the evidence.

### 1. The Warehousing Transactions

█ In instructing the jury, the District Court summarized Marion's theory with regard to the warehousing transactions entered into between Bentley, Benghiat and Marzouca as follows:

> [T]he fundamental contention is that if the money had not been put up by [Peninsula Bank when it was,] . . . the fraudulent scheme would have terminated at that time because Mr. Bentley was running out of money and could not have continued and, therefore[,] . . . the damages amount to all of the money that was invested in the receivership estate after the loan was agreed to.

This cannot serve as a basis for finding Benghiat and Marzouca liable to Marion (substituting for BFS). Our cases make clear that there cannot be liability to a corporation for increasing its short-term liquidity. This is so even where (as al-

leged here) the new money brought into the company allowed it to stay afloat long enough to put itself in a worse position than it was in prior to the cash infusion. *See In re CitX Corp.*, 448 F.3d 672, 677–78 (3d Cir.2006); *Thabault*, 541 F.3d at 521.

The problem in this kind of scenario is one of proximate causation. Between the initial act (the injecting of money into the business) and the end result (the expansion of the company's debt relative to where it was prior to the cash infusion) stand the intervening acts of the company's management (*i.e.*, what it chose to do with the money). We illustrated this point in *CitX.* There the trustee for a company that had operated a Ponzi scheme brought suit against the company's accounting firm, arguing that the firm's negligent financial reports had allowed it to hide its true financial condition from investors, thus raising more money and eventually going even deeper into debt. 448 F.3d at 674–78. We held that a jury could not conclude that the accounting firm had caused the company's economic injuries on those facts, reasoning as follows:

> [CitX argues] that the $1,000,000 equity investment allowed CitX to exist long enough for its management to incur millions more in debt. But that looks at the issue through hindsight bias. . . . [T]he equity investment was hardly harmful to CitX. Its management . . . misused the opportunity created by that investment; . . . and therein lies the harm to CitX.

*Id.* at 677–78; *see also Thabault*, 541 F.3d at 521 ("To the extent that the extra capital, which decreased CitX's insolvency, extended the corporation's life and allowed management to incur more debt, the ulti-

---

**19.** Because the jury found both Benghiat and Marzouca liable, it had to have found (1) to be true. We do not know whether it also found

(2) to be true, and can only speculate that it did based on its having apportioned more liability to Benghiat than Marzouca.

mate harm was caused by mismanagement, not the auditor."). For just that reason, the warehousing transactions cannot serve as basis for Benghiat and Marzouca's liability to BFS (even if engineered with full awareness of Bentley's scheme). The losses BFS suffered as a result were proximately caused by Bentley's subsequent actions, not the cash infusion itself.[20]

### 2. Benghiat's Supervision of Bentley's Operation

The other basis for finding liability (with respect to Benghiat) related to the roughly 18 months during which Bentley brokered securities under the supervision of SSI (Benghiat's firm). Pre-trial, it was a matter of considerable dispute whether Benghiat's duty to supervise Bentley's sales of securities at SSI extended to his CD-brokerage operation, since CDs purchased from federally regulated banks are not generally considered securities for purposes of federal securities law. *See Marine Bank v. Weaver*, 455 U.S. 551, 558–59, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). The position ultimately taken by the District Court (and charged to the jury) was that "[t]o the extent that [Bentley] altered the terms of [the] certificates of deposit, the certificates themselves would be considered securities, and to the extent that he issued what amounted to investment contracts certifying that he was investing or had invested, those certificates he issued would qualify as securities."

We need not decide whether the District Court was correct to conclude that, insofar as Bentley was brokering fake CDs, he was selling securities, and thus that Benghiat had a duty to supervise that aspect of Bentley's operation as well. That is because, even if Benghiat had such a duty, it ran to the investors who purchased the fake CDs, not to BFS, the company through which the fake CDs were sold.

In his complaint, Marion asserted that Benghiat is secondarily liable under section 20(a) of the Securities Exchange Act of 1934 for Bentley's violations of SEC Rule 10b–5, which prohibits fraudulent schemes and devices in connection with the sale of securities.[21] Section 20(a) provides in pertinent part that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with[,] and to the same extent as[,] such controlled person to any person to whom such controlled person is liable ....

15 U.S.C. § 78t(a). In the context of the "broker-dealer" relationship like the one at issue here, we have described section 20(a) as imposing "a stringent duty to supervise employees." *Rochez Bros. Inc. v. Rhoades*, 527 F.2d 880, 886 (3d Cir.1975).

---

**20.** We take no position on whether, in a suit brought by the investors against Benghiat and Marzouca, the same proximate cause problem would arise. An investor suit might bring in a wider scope of activity than this one—what Benghiat and Marzouca allegedly helped Bentley do to the investors. Here, our focus is simply on what transpired among Benghiat, Marzouca and BFS and our conclusion that the transactions at issue did not harm BFS.

**21.** Rule 10b–5 makes it "unlawful ... [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the ... sale of any security." 17 C.F.R. § 240.10b–5. It implements section 10(b) of the Securities Exchange Act of 1934, which makes it "unlawful" to "use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

But, even though section 20(a) could make Benghiat liable for Bentley's Rule 10b–5 violations in the right circumstances, we do not see how it could make Benghiat liable to BFS (and thus Marion) for those violations. To make out a securities fraud claim under Rule 10b–5, "a plaintiff must show that '(1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury.'" *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 268 (3d Cir.2005) (quoting *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004)). Plainly, BFS could not establish the third of these elements against Bentley-that it was caused harm through its reliance on Bentley's deceit. BFS did not rely on Bentley's misrepresentations. Rather, as we said earlier, any harm to it was brought about by becoming liable for Bentley's fraud on the investors.

If Bentley could not be liable to BFS for violating Rule 10b–5, then Benghiat could not be secondarily liable to BFS for Bentley's violation. The liability section 20(a) imposes on "controlling persons" is specifically liability to those *"to whom [the] controlled person is [also] liable."* § 78t(a) (emphasis added). In this case, that could only be the defrauded investors. Section 20(a) therefore cannot support the use to which Marion put it here—to impose a duty on Benghiat to BFS to prevent Bentley from defrauding the investors. Because Bentley's duty under Rule 10b–5 not to defraud his investors only ran to them, any corresponding supervisory duty Benghiat might have had only ran to those investors as well.

Once again, the facts we presume were found by the jury (in this instance, that Benghiat provided inadequate supervision of Bentley's activities at SSI) cannot support liability to Marion. If Benghiat did breach a duty to supervise under these facts, it was a duty owed to Bentley's investors, not to the corporation through which the securities were sold.

\* \* \* \* \* \*

We conclude that, based on our case law, Marion did have standing to bring the claims presented to the jury. However, we also conclude that, on the facts presented to the jury, neither Benghiat nor Marzouca can be liable to Marion acting as BFS's receiver. Accordingly, we reverse the District Court's denial of Benghiat and Marzouca's post-trial motion for judgment as a matter of law and remand with instructions to enter judgment in favor of the defendants.