NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1553
_____

DAVID H. MARION, RECEIVER FOR BENTLEY FINANCIAL SERVICES, INC.,

Appellant

v.

HARTFORD FIRE INSURANCE COMPANY

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-06-cv-04666)
District Judge: Honorable Mitchell S. Goldberg
_____

Argued September 19, 2012
_____

Before: AMBRO, GREENAWAY, JR., and O'MALLEY[*], Circuit Judges

(Opinion filed: May 16, 2013)


David D. Langfitt, Esquire
Locks Law Firm
601 Walnut Street
The Curtis Center, Suite 720 East
Philadelphia, PA   19106


John H. Lewis, Jr. Esquire

_____

[*] Honorable Kathleen M. O'Malley, United States Court of Appeals for the Federal Circuit, sitting by designation.

1

Montgomery, McCracken, Walker & Rhoads
120 South Broad Street, 28th Floor
Philadelphia, PA   19109

David H. Marion, Esquire
Richard G. Tuttle, Esquire (Argued)
Oleg V. Nudelman, Esquire
Archer & Greiner, P.C.
One Liberty Place
1650 Market Street, 32nd Floor
Philadelphia, PA 19103-7393

        Counsel for Appellant

Bruce L. Phillips, Esquire (Argued)
Jeffrey C. Venzie, Esquire
Venezie, Phillips & Warshawer
2032 Chancellor Street
Philadelphia, PA 19103

        Counsel for Appellee

————————————

OPINION

————————————

O'MALLEY, Circuit Judge

        David H. Marion ("Marion"), in his capacity as receiver for Bentley Financial

Services, Inc. ("BFS"), brought suit against Hartford Fire Insurance Company

("Hartford") seeking indemnification under a fidelity bond issued by Hartford to BFS and

the Entrust Group ("Entrust").  The district court granted summary judgment in favor of

Hartford, holding that Marion failed to raise a genuine dispute of material fact regarding

whether BFS suffered a covered loss under the fidelity bond.  Because Marion set out

sufficient material facts to support his claim that BFS incurred a covered loss when its

president and chief executive officer, Robert Bentley ("Bentley"), embezzled funds from both BFS and Entrust accounts, we reverse.

## I.    BACKGROUND

Bentley was the president and controlling shareholder of BFS, a Pennsylvania investment firm that brokered certificates of deposit ("CDs"). Bentley formed Entrust to act as custodian for CDs brokered by BFS. From June 1996 to October 2003, Bentley orchestrated a Ponzi scheme through BFS and Entrust. A Ponzi scheme is an investment fraud in which investors are paid off, not with returns generated by their investments— because their money usually is converted, not invested—but with revenue generated from later investors. Here, Bentley oftentimes sold fictitious CDs, even selling the same fake CD to multiple customers. When he sold actual CDs, he often misrepresented their terms to his customers. Bentley would sell the CDs on behalf of BFS and instruct investors to send their funds to Entrust. Entrust would sometimes transfer funds to BFS accounts, from which interest payments would be made to investors to help keep the scheme afloat. Throughout the scheme, it appears that Bentley also used both the Entrust and BFS accounts as personal banks—embezzling the bulk of the funds taken in for his own uses. Bentley was eventually prosecuted, convicted of fraud, and sentenced to fifty-five months of imprisonment. [1]

In an action bought by the Securities and Exchange Commission against Bentley, BFS, and Entrust, Marion was appointed receiver for all three defendants. In this

---

[1] In a previous case involving Bentley's scheme, this court described the fraud in more detail than is necessary here. *See Marion v. TDI Inc.*, 591 F.3d 137, 141-43 (3d Cir. 2010).

capacity, Marion brought the current action on behalf of BFS against Hartford, seeking to recover under a fidelity bond issued by Hartford for the losses incurred from Bentley's scheme.

The fidelity bond in dispute was issued by Hartford and insured both BFS and Entrust. While Marion filed no action on behalf of Entrust, even though Entrust is a named insured on the fidelity bond, the Entrust assets are included in the BFS receivership. The policy limit on the fidelity bond is $2 million, with a $10,000 deductible. The bond states:

> The Underwriter . . . agrees to indemnify the Insured for:
>
> INSURING AGREEMENTS
>
> FIDELITY
> (A)  Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
> Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
> (a)  to cause the Insured to sustain such loss; and
> (b)  to obtain financial benefit for the Employee or another person or entity.

J.A. 65. An "Employee" is defined to include, among others:

> [A]n officer or other employee of the Insured, while employed in, at, or by any of the Insured's offices or premises covered hereunder, and a guest student pursuing studies or duties in any of said offices or premises.

J.A. 66. In a section entitled "OWNERSHIP," the bond provides further detail on covered losses:

4

OWNERSHIP

> Section 10. This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable. This bond shall be for the sale use and benefit of the Insured named in the Declarations.

J.A. 69. "Property" is defined to include, among other things, "Money," J.A. 67, which, in turn, means "a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency," J.A. 66.

Before the district court, Hartford moved for summary judgment, arguing that no genuine dispute existed regarding whether BFS suffered a covered loss. Specifically, Hartford asserted that "Bentley did not steal any money which was owned by BFS, or held by BFS, or for which BFS was legally liable," J.A. 110 (Def. Hartford Fire Ins. Co.'s Br. in Supp. of Mot. for Summ. J. 11), tracking the language in the fidelity bond's ownership provision quoted above. According to Hartford, BFS suffered no covered loss because "all of the money belonged to the investors." J.A. 112. And BFS did not "hold" the money, Hartford contended, because the investor funds were held instead by Entrust or Bentley. Hartford last argued that BFS was not "legally liable" for the investor funds. On this point, Hartford urged that, to be covered under the fidelity bond, the purportedly lost funds must have been obtained lawfully, not, as here, through fraud.

Marion responded with two arguments. First, Marion asserted that BFS experienced an actual loss when BFS incurred contractual liability to its investors through the investment contracts in which Bentley sold fictitious or misrepresented CDs on behalf of BFS. But Marion did not develop this argument in his brief. Instead, most of

5

Marion's opposition was based on his second argument, an embezzlement theory: BFS incurred a covered loss when Bentley embezzled funds that were "owned" by BFS under the bond. That is, the embezzled funds were either "held" by BFS itself or were funds for which BFS was "legally liable." BFS was liable for the investor funds held by Entrust, Marion argued, because BFS was the entity that actually sold the fraudulent investments and, thus, was liable to investors for those sales. Marion further contended that the embezzled funds were constructively held by BFS, and that the corporate distinction between BFS and Entrust should be disregarded (Marion acknowledged that BFS and Entrust are legally distinct from Bentley).

The district court sided with Hartford, finding that Marion failed to raise a genuine dispute that BFS suffered a covered loss. It rejected Marion's first argument because a fidelity bond, which is distinct from liability insurance, is an insurance contract that indemnifies against the loss of property, not a contract that insures against liability to third parties. Although it recognized that the fidelity bond covers the loss of property for which the insured is legally liable, the district court believed that a loss under the bond is not incurred unless the insured spends its own money as a result of the liability, i.e., until the insured experiences an actual monetary loss arising from the legal liability. Because it found that BFS expended no money to make good on the obligations to its investors, the district court held that BFS suffered no covered loss. The district court also rejected Marion's argument that BFS suffered a loss when Bentley embezzled the investor funds out of BFS and Entrust accounts because BFS did not "own" the embezzled funds, since the money belonged to the investors. BFS challenges these rulings on appeal.

6

## II. DISCUSSION

We review a district court's grant of summary judgment under a plenary standard, applying the same standard as the district court. *See Smith v. Borough of Dunmore*, 633 F.3d 176, 179 (3d Cir. 2011). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The non-moving party is 'entitled to every favorable inference that can be drawn from the record,' and we will affirm only if there is no genuine issue for trial." *Smith*, 633 F.3d at 179 (quoting *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 466 (3d Cir. 2005)).

This case involves the interpretation of a fidelity bond, and the parties agree that Pennsylvania law applies. In that state, a "fidelity bond is a contract of insurance, and the rules of interpretation of insurance policies apply." *Penn Twp. v. Aetna Cas. & Sur. Co.*, 719 A.2d 749, 750 (Pa. Super. Ct. 1998). We undertake plenary review of the scope of an insurance policy because "the proper coverage of an insurance contract when the underlying facts are not in dispute is a question of law." *Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C.*, 821 F.2d 216, 219 (3d Cir. 1987). When interpreting insurance contracts, "the intent of the parties as manifested by the language of the written instrument" controls. *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983). That is, if "the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Id.*

On appeal, Marion abandons any argument that BFS's contractual liability to investors—liability it has insufficient funds to satisfy—constitutes a recoverable loss under the fidelity bond. *See* Br. of Appellant 19 ("In no sense did Receiver ever suggest that BFS's legal liability gave rise to an insurable interest unrelated to the property embezzled."). Marion appears to recognize that such contractual obligations are not the proper subject of fidelity bonds. A "fidelity bond is a contract of indemnity against loss," not against liability untied to an actual loss. 11 Lee R. Russ & Thomas F. Segalla, Couch On Insurance § 160:7 (3d ed. 2012). For its part, Hartford does not defend the trial court's conclusion that the fidelity bond would not cover funds for which an insured is legally liable unless and until the insured expends its own funds to reimburse those whose property was stolen. The parties narrow their focus on appeal.

Marion argues that, to the extent Bentley embezzled funds from BFS accounts, that money was clearly money "held" by BFS for investors and were funds for which BFS was "legally liable." To the extent the money was kept in Entrust accounts, Marion argues that Entrust was acting as the custodian of funds for which BFS remained liable at all times. Hartford responds by contending that, because investor money went directly to Entrust accounts, it was never held by BFS; according to Hartford, that Bentley occasionally moved funds through BFS accounts does not change which entity actually "held" them. As for the argument regarding BFS's legal liability for funds in either account, Hartford argues that one cannot be legally liable for funds within the meaning of the fidelity bond unless those funds were "legally" or "lawfully" obtained.

8

We agree with Marion that there are genuine disputes of fact regarding whether BFS suffered covered losses under the fidelity bond arising from Bentley's embezzlement activities. Accordingly, for the reasons explained below, we vacate the judgment entered in favor of Hartford and remand for further proceedings.

The fidelity bond is clear about what it covers: it insures against the "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee." J.A. 65. The fidelity bond's ownership provision elaborates on the losses covered under the bond: "This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable." J.A. 69. There is no strict ownership requirement under the bond—property losses are covered under the bond even when the property is only held in some capacity for another or is property for which the insured is legally liable.

Marion adduced evidence that Bentley embezzled funds which BFS held. Bentley sold fraudulent CDs to investors on behalf of BFS. The investors sent their money to Entrust and, at times, Entrust would, in turn, transfer investor money to BFS accounts from which payments to certain investors would occur. Marion presented several cancelled checks that Bentley wrote to either himself or third-parties from BFS bank accounts. *See* J.A. 271-84, 339-57. BFS undoubtedly "held" certain funds in its own bank accounts and it appears undisputed that some of Bentley's embezzlement was of those funds. We are unpersuaded that BFS had to be designated the formal custodian of the funds before the funds sitting in its accounts could be deemed "held" by BFS. The

9

bond references funds "held in any capacity," J.A. 69; even a temporary capacity or a clearinghouse capacity would satisfy this broad provision.

Marion's argument that BFS suffered covered losses to the extent funds were embezzled from Entrust accounts is more complicated than his argument regarding the funds in BFS's own accounts. Marion argues that the funds in Entrust accounts, while not "held" by BFS, were still funds for which BFS was legally liable. Marion adduced substantial evidence in support of this theory. He first presented evidence regarding the relationship between BFS and Entrust. The investment contracts of record indicate that BFS was the entity making the sale. *See* J.A. 201-26. Under those contracts, BFS was required to purchase on behalf of the investors CDs with specific terms, and had an obligation to pay interest to the investors. *See id.* Pursuant to those same contracts, investors transferred funds to Entrust, as custodian of the sale proceeds. BFS directed the transfer of monies from the Entrust accounts to the BFS accounts for various purposes, including making interest payments to investors. Testimony of Bentley confirmed this relationship. *See* J.A. 181 (Tr. of Jury Trial, Bentley Direct 90, May, 25, 2006, *Marion v. TDI, Inc.*, No. 02-17176 (E.D. Pa.)) ("I formed the Entrust Group to act as the custodian for their certificates of deposit for the clients of Bentley Financial Services."). From this, a reasonable juror could conclude that BFS was at all times legally liable for the funds directed to the Entrust accounts. We see nothing in the fidelity bond that requires that funds for which an insured is legally liable be maintained in an account in the insured's name.

Marion next adduced evidence that Bentley embezzled substantial funds from the Entrust accounts. Marion produced several checks drawn from Entrust accounts. *See* J.A. 285-95, 329-33. And he proffered Bentley's testimony that Bentley regularly wrote checks from Entrust accounts to himself and others. J.A. 173. Marion then proffered testimony that Bentley directly deposited embezzled funds into his personal accounts and used the stolen money to pay taxes to cover up the scheme, to "entertain" himself and his employees, for his own personal country club expenses, to cover his personal trading losses, and for "escort services." J.A. 862-67. There is, thus, material evidence on the record that the very type of loss covered by the fidelity bond occurred.

Hartford's only contention refuting Marion's argument regarding its legal liability for Entrust funds is that, because the investor funds were not legally obtained (i.e., they were obtained through Bentley's fraud), no covered loss can result from the embezzlement. We are not persuaded. No such requirement is evident from the fidelity bond. The bond covers the loss of property owned or held by BFS, or property for which it is legally liable, regardless of how the property is acquired. Pennsylvania's principles of contract interpretation permit no other reading of the bond—it plainly contains no requirement that the funds be "legally" obtained before an insured could be deemed "legally liable" for them. *See Standard Venetian Blind Co.*, 469 A.2d at 566 ("Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language."). Indeed, Hartford supplies no legal authority in support of the position it urges. In sum, its argument is unpersuasive.

III. REMAND

11

We decide today only that the district court erred in granting summary judgment in favor of Hartford on the ground that BFS neither owned, held, nor was legally liable for any of the embezzled funds. We do not address, because the record is not developed on them, other predicate questions relating to liability under the fidelity bond. Thus, we do not determine whether the loss of any investor funds resulted "directly" from Bentley's dishonest acts or if the funds were taken with the requisite intent to cause BFS to sustain a loss and gain financial benefit for Bentley. We also cannot and do not express an opinion on the amount of any covered loss.

## IV. CONCLUSION

For the foregoing reasons, we vacate the district court's grant of summary judgment in favor of Hartford and remand this case for further proceedings in accordance with this decision.