# Kirschner v. K&L Gates LLP

C.P. of Allegheny County, no. GD09-01557.

*Roy E. Leonard, Richard O. Earley, Hector Torres, Cara M. Ciuffani,* and *Matthew R. DiBlasi,* for plaintiff

*David B. White, Ira L. Podheiser, Michael S. Sundermeyer, Craig D. Singer, Ana C. Reyes,* and *Monica*

*M. Leon,* for defendants K&L Gates LLP and Sanford Ferguson.

*Patricia L. Dodge, Chad I. Michaelson, Brandon B. Rothey, Jeffrey C. Sotland,* and *Daniel J. McCarthy* for defendants Pascarella & Wiker LLP and Carl A. Wiker.

WETTICK JR., *J.,* December 28, 2010—The preliminary objections of K&L Gates LLP and Sanford Ferguson ("K&L") and the preliminary objections of Pascarella & Wiker, LLP and Carl A. Wiker ("Pascarella") seeking dismissal of each count within plaintiff's first amended complaint are the subject of this opinion and order of court.

The facts, as set forth in the amended complaint, are as follows:

This litigation arises out of the CEO's looting of Le-Nature's (a Delaware corporation) that led to an involuntary bankruptcy proceeding instituted in the United States Bankruptcy Court for the Western District of Pennsylvania. In the bankruptcy proceeding, the court created the Le-Nature's Liquidation Trust which holds all assets and property of Le-Nature's, including any causes of action possessed by Le-Nature's. Plaintiff (Marc Kirschner) was appointed trustee of this trust.

Le-Nature's was founded in 1992 by Gregory J. Podlucky ("Podlucky"). Within a year of its formation, Le-Nature's produced a line of beverage products that included ice tea, lemonade, and juice-based drinks.

From the date of the formation through the institution of the bankruptcy proceedings, it appears that Podlucky was the sole shareholder of the company's common stock; he

also served as its chief executive officer until days before the institution of the bankruptcy proceedings.

In 2000 and 2002, Le-Nature's issued shares of convertible preferred stock that were purchased by three investment funds. The certificates governing these shares granted to the holders of these shares the right to appoint directors to the board, to approve all capital expenditures, and to compel a sale of Le-Nature's by no later than September 2006.[1]

After 2002, the corporation consisted of two groups of equity holders: Podlucky (who was looting the company) and the investors (holders of the preferred stock).

In August 2003, Le-Nature's outside auditor (Ernst & Young) was conducting a routine quarterly review of Le-Nature's finances. The review included a meeting with Le-Nature's chief financial officer, chief administrative officer, and vice president of administration. At this meeting, held on August 13, 2003, each stated that he or she had serious concerns about the accuracy of Le-Nature's sales figures.

On the next day, each of these persons submitted letters of resignation. In these letters, they expressed concern about the manner in which the business was being conducted. In his letter, the chief financial officer stated that Podlucky made it impossible for him to discharge his duties to the company because Podlucky maintained almost absolute control over the company's detailed financial records and denied him access to the documentation supporting the

---

1. With the appointment of the three additional directors, the board consisted of four members selected by Podlucky and three members selected by the investors.

company's general ledger.

At the time of his resignation, the chief financial officer provided one of the independent directors with a list of his concerns. In addition, he informed the audit partner of Ernst & Young of the resignation letters.

The minority directors immediately discussed the need for an investigation. Thereafter, on August 22, 2003, Ernst & Young sent a letter advising Le-Nature's that Ernst & Young could not be associated with any financial statements until the allegations in the resignation letters were investigated by independent counsel.

On August 26, 2003, Le-Nature's board of directors consented to the creation of a special committee to conduct an investigation into the allegations and circumstances of the resignation of the three senior financial managers. The special committee which the board created was composed of the three nonemployee directors on the board who represented the interests of the minority shareholders. None was an employee.

The resolution creating the special committee authorized the committee to hire legal counsel and accountants to assist in the investigation. On August 28, 2003, the special committee retained K&L to investigate the circumstances that led to the resignation of the three senior financial managers. Lead counsel was Sanford Ferguson, a defendant in these proceedings.

The terms of the engagement are set forth in a letter dated August 28, 2003 from Mr. Ferguson to the chair of the special committee attached to plaintiff's amended complaint as Exhibit A. The relevant portion of the letter

reads as follows:

> You have asked us to represent the special committee ("special committee") of outside directors of Le-Nature's Beverages, Inc. ("company") in connection with a review of the circumstances attendant upon the recent resignation of three members of the finance staff of the company.
>
> It is our firm's practice to confirm in writing the identity of any client whom we represent, the nature of our undertaking on behalf of that client and our billing and payment arrangements with respect to our legal services.
>
> We understand that we are being engaged to act as counsel for the special committee and for no other individual or entity, including the company or any affiliated entity, shareholder, director, officer or employee of the company not specifically identified herein. We further understand that we are to assist the committee in investigating the facts and circumstances surrounding the aforementioned resignations and assist the special committee in developing any findings and recommendations to be made to the full board of the company with respect thereto. The attorney-client relationship with respect to our work, including our work product, shall belong to the committee. Only the committee can waive any privilege relating to such work.
>
> Our firm currently represents Star Associates in connection with a contract dispute with the company. This matter is substantively unrelated to the scope of

the work of the special committee. We believe that our ongoing representation of Star Associates will not adversely affect our exercise of independent professional judgment on behalf of the special committee.

Nonetheless, we will establish a "Chinese Wall" between those of our personnel working on the Star Associates matter and those working on the special committee matter. In view of the ongoing duties of loyalty we would owe to both Star Associates and the special committee, we wish to confirm at the outset of our engagement by the special committee that you concur with our conclusions set forth above and that you waive any potential or actual conflict of interest relating thereto. Amended complaint, Ex. A at 1-2.

K&L selected P&W, an accounting firm, to assist in the investigation. Exhibit B to plaintiff's amended complaint is a September 12, 2003 retention letter from a partner of the accounting firm to Mr. Ferguson. The second paragraph of the letter sets forth P&W's understanding of its role:

UNDERSTANDING OF P&W's ROLE

It is understood that P&W is being retained to assist K&L as a financial expert related to the special investigation of certain transactions involving LeNature's, Inc. ("LeNature's"). P&W shall provide general consulting, financial, accounting, and investigative or other advice as requested by K&L to assist it in rendering legal advice to LeNature's. Acting as a consultant to counsel, we understand that all work and communications relating to this engagement are expected to be confidential and privileged and will be

so treated unless otherwise directed by you, or required by law or court order.

Payment for P&W's services is governed by the following provision in the September 12, 2003 letter:

> P&W will render monthly invoices to K&L. K&L will then include our charges as part of its regular monthly invoices to LeNature's. We understand that under the terms of K&L's engagement by LeNature's, K&L's invoices are payable within thirty days of submission. We reserve the right to cease all work if any K&L invoice to LeNature's becomes past due, without regard to the status of our services or any related procedures. K&L will promptly pay our invoices as the funds therefore are received from LeNature's. It is understood that K&L will not be otherwise responsible for payment of fees and expenses to P&W, as such responsibility ultimately rests with Le-Nature's, Inc. amended complaint, Ex. B at 1-2.

The amended complaint sets forth factual allegations that would, if proven, establish that at the time of the investigation, the improper activities which the three former senior financial officers suspected to be taking place were, in fact, taking place. However, K&L did not discover the misconduct of Podlucky because its investigation fell below an acceptable standard of care for many reasons, including the narrowing of the scope of the investigation to less than what was required, reliance on uncorroborated explanations offered by Podlucky, the failure to demand backup writings (which were, in fact, nonexistent), and the failure to obtain bank account statements from Le-Nature's bank.

K&L furnished its report, dated December 8, 2003, to the special committee.[2] On December 9, 2003, the special committee sent the report, along with a covering memo, to the board of the directors. This memo (Exhibit D to plaintiff's amended complaint) reads as follows:

> The special committee of the board of directors of Le-Nature's Inc. ("Le-Nature's" or the "company") hereby submits the report attached herein prepared by the committee's counsel, Kirkpatrick and Lockhart LLP ("K&L") and its financial consultants Pascarella & Wiker, LLP ("P&W").
>
> The special committee was formed in August 2003 to investigate certain specific business transactions identified by three former company employees (the "Employees"), all of whom resigned in mid-August 2003. The special committee consists of two outside directors who are representatives of the SW Pelham Fund, L.P. ("Pelham") and one director representing George K. Baum Merchant Banc, LLC ("Baum").
>
> Upon the advice of counsel, the committee limited the scope of its investigation to seven specific transactions Identified by the employees as areas of concern and that could potentially impact the company's financial statements. The committee did not examine any underlying motives of the employees, their relationship to other members of senior management, the employees' job performance or their respective competencies in performing their specific job

---

2. This report is attached to plaintiff's amended complaint as Exhibit C.

functions.

The committee is pleased to report that K&L and P&W "found no evidence of fraud or malfeasance with respect to any of the transactions reviewed by it. Further counsel found no evidence which suggests that the transactions identified by the former employees as being of concern had not been property reported on La-Nature's financial statements". This second finding is subject to a review by Le-Nature's independent auditors on two of the transactions: 1) a barter transaction described in Section IV (F)(3) of the attached report and 2) the accounting of a settlement payment with one of its vendors described in section IV (B) of the report.

In the course of its review, counsel uncovered some weaknesses in Le'Nature's management structure, specifically in the areas of segregation of duties and supporting documentation that need further review by the board of directors. Since the initial investment made by Pelham and Baum, the company has augmented its senior management. The company has completed its plant build out, added bottling manufacturing capabilities and expanded its sale and marketing expertise. The special committee has noticed an "esprit de corps" among current senior management in the aforementioned job areas. This same mindset, however, must extend to mangers in the finance department.

K&L recommends the following:

- A segregation of duties, particularly in the areas of

equipment purchases, tea leaf purchases and Bulk Tea Product Sales.

- Adopting standards of supporting documentation and implement procedures to ensure that the documentation standards are consistently followed.

- The appointment of a permanent CFO and controller. These employees would be the architects for improving Le-Nature's financial Infrastructure. A profile for the type of individuals needed and their specific duties can be found in Section, (C) of the report.

- Formation of audit & compensation committee consisting of independent directors.

- Establish segment reporting for Bulk Tea Sales and Ready-to-Drink Products.

- Have greater familiarity with the financial condition of any of its vendors, specifically: Pollinger and Ritz Foods.

The committee concurs strongly with all the recommendations outlined above.

We look forward to talking with the full board of directors on these recommendations and other findings of fact as soon as possible and to work with the company in addressing the issues raised herein.

This memo is an accurate summary of the report. The first paragraph of the report under section V, conclusions & recommendations, reads as follows:

Counsel found no evidence of fraud or malfeasance with respect to any of the transactions reviewed by it. Further, counsel found no evidence which suggests that the transactions identified by the former employees as being of concern had not been properly reported on Le-Nature's financial statements, subject to a review by Le-Nature's independent auditors of (i) the accounting for the barter transaction described in section IV(F)(3) above, and (ii) the extent to which the CCC settlement payments described in Section IV(B) above should be allocated between an amount (for the fair value of the equipment) and an expense (if, and to the extent that, the payments to CCC exceeded the fair value of the asset acquired). Amended complaint, Ex. C at 30.

Thereafter, under the same heading, the report contains three and a half pages of remedial actions that should be taken because of weaknesses in Le-Nature's management structure.

Plaintiff alleges that because K&L failed to discover the massive fraud, Podlucky was now armed with a clean bill of health that allowed him to continue looting the company, increasing its debt, and wasting funds on unnecessary transactions resulting in total damages of more than $500 million. At ¶3 of its amended complaint, plaintiff alleges that in 2002 the company reported net sales of more than $135 million while the actual net sales were less than $2 million.

In May 2006, the minority shareholders — represented by the independent directors on the board — initiated an action in Delaware Chancery Court (*George K. Baum Capital Partners, L.P. v. Le-Nature's Inc.,* civil action No.

2158-N) (Del. Ch. 2006)) against Le-Nature's and its four inside directors in order to prevent Le-Nature's from building a facility in Florida.[3] In October 2006, the minority shareholders learned of an apparent forgery which led to the appointment of a custodian to operate the company on October 27, 2006. Within days, the custodian uncovered massive fraud that K&L should have uncovered.

On November 1, 2006, several of Le-Nature's creditors initiated involuntary liquidation proceedings under chapter 7. On November 3, 2006, the custodian converted the proceeding to a chapter 11 proceeding. On November 13, 2006, Le-Nature's remaining plant was closed and production never resumed.

Plaintiff alleges that if K&L had competently discharged its duties and obligations, Podlucky's massive looting would have ended in late 2003 or early 2004 because the independent directors would have obtained a court order closing down the company. The company would then have been liquidated as a failed company with significant assets.

In summary, this is a lawsuit instituted on behalf of the creditors of Le-Nature's. In plaintiff's brief in opposition to the preliminary objections of defendants K&L Gates, LLP, Sanford Ferguson, Pascarella & Wiker LLP, and Carl A. Wiker ("plaintiff's brief") at 41-42, plaintiff

---

3. In the initial complaint filed in those proceedings, the holders of the preferred stock (apparently believing that the company had considerable value) alleged that Podlucky, as part of a plan to coerce the holders of the preferred stock to sell to Podlucky at a bargain price, intended to build this third facility in order to discourage potential purchasers of Le-Nature's from making their highest and best offers.

identifies the creditors as the sole or primary beneficiaries of any recovery. Plaintiff characterizes these creditors as the victims of the acts of the corrupt CEO and avers that recovery by the trustee will increase the assets available to the creditors. Plaintiff contends that barring his claim would harm these innocent parties while protecting the professionals whose inexcusable misconduct caused enormous harm to the company.

## I. PRELIMINARY OBJECTIONS OF K&L

### A. *COUNT I-PROFESSIONAL NEGLIGENCE*

Plaintiff's first cause of action against K&L seeks recovery based on professional negligence. For two reasons, I am dismissing this cause of action: the absence of any obligations owed to "the corporation" and the absence of any losses.

### 1. *NO ATTORNEY-CLIENT RELATIONSHIP*

Plaintiff contends that K&L formed an attorney-client relationship with Le-Nature's; thus, the law firm owed an obligation to this corporation to exercise ordinary skill, care, and diligence in conducting the investigation. According to plaintiff, the investigation of possible mismanagement was being conducted by the special committee for the benefit of the corporation.

Plaintiff would liken this case to the situation in which information has come to the attention of the board of directors that a vice president in charge of the company's expansion in India may be purchasing property for the company at very inflated rates from sellers controlled by her relatives. The company appoints a special committee

of three directors to conduct an investigation and report the results to the entire board. The committee hires a law firm with an office in India which fails to discover that the vice president is engaging in such activities. Three years later, it is discovered that she has been engaging in such conduct. During this three-year period, the company overpaid an additional $11 million in twelve transactions.

In this instance, I would find no merit to the position that K&L is taking in this case, that the only party that may sue is the subcommittee (which will never experience any losses). It would not matter that the engagement letter used language similar to the language of the engagement letter used in this case. A law firm cannot include language in an engagement letter that will immunize the firm from liability for malpractice.[4]

In this hypothetical, the alleged misconduct impacted each shareholder; no shareholder was involved in the misconduct; and the law firm knew that it was being retained to protect each shareholder from future misconduct. Thus, the corporation is an entity that may bring a malpractice action to recover losses sustained from the law firm's failure to discover the fraud.

The present case is very different from my hypothetical. In the present case, there are two groups of equity holders: Podlucky and the investors (holders of preferred stock).[5]

---

4. Section 51(3) of the restatement (third) of the Law Governing Lawyers (2000), provides that a lawyer owes a duty of care to a nonclient when (a) the lawyer knows the client intends that the lawyer's services benefit the nonclient, (b) such a duty will not significantly impair the lawyer's performance of obligations to the client, and (c) the absence of such a duty would make enforcement of those obligations to the client unlikely.

5. See amended complaint, Ex. C at 2, December 8, 2003 report

144

The law firm would have understood that it was being hired to protect the investors (who are not involved in the operation of the company) by conducting an investigation into the manner in which Podlucky was operating the company. If the law firm's investigation was not competently performed, the investors are the only parties that may sue for any losses because the only role of the law firm was to protect their interests.[6]

Assume that as of December 8, 2003, Le-Nature's, while being looted, had a net worth of $6 million that would have been preserved if K&L had detected the fraud in December 2003. However, as of 2006, Le-Nature's debts far exceeded its assets.

Under this scenario, I can explain why K&L would owe $6 million to the investors:

The special committee was created to protect the investments of the investors; the law firm knew that its mission was to do so; and the investors whom the law firm was hired to protect lost $6 million because of the failure of the law firm to protect the interests of the investors.

However, I cannot explain why the cause of action for malpractice should instead belong to a trustee for the

which states that Gregory J. Podlucky is the sole common stockholder. Also see LeNature's notice of removal, No. 06-25454-BM, Doc. 12 at 1-2, ¶3 (Bankr. W.D.Pa. 2006), which describes the action in Delaware Chancery Court at Civil Action No. 2158-N as involving "a dispute between the original common shareholder and [the owners of] preferred shares of the debtor, who are locked in a dispute for control of the operations of the reputed debtor."

6. It is possible that a law firm could also be liable to a creditor who read and relied on the December 8, 2003 report under Restatement (Second) of Torts §552. However, the creditor would need to bring its own lawsuit against the law firm by filing a complaint which alleged material facts supporting recovery under §552.

creditors, rather than the holders of the preferred stock.[7] Furthermore, I cannot explain why the law firm would owe money to any entity other than the entity it was hired to protect — the holders of the preferred stock.

Even if there may be some theory, not described by plaintiff, that would shift the law firm's responsibility to Le-Nature's creditors as of December 2003 upon a showing that the corporation was insolvent as of December 2003, recovery would be limited to what these 2003 creditors would have received if the business had been liquidated in December 2003 less payments subsequently received. There is no theory that would impose liability on K&L for losses of post-2003 creditors who had no relationship with Le-Nature's as of December 2003 and who had no knowledge of the 2003 investigation and report.

Assume that X hires a lawyer to advise X as to whether it is legal for X to purchase cigars made in Cuba through a Canadian wholesaler. The lawyer mistakenly states that it is legal. X borrows $1 million to establish six Cuban cigar bars in New York City. Eventually, the government closes down the bars and imposes a $150,000 fine. This causes the corporation to go out of business. Under a "but for" test, the law firm would be liable to the lender.

However, the scope of an attorney's obligations has never been measured by a "but for" test.[8] Under Pennsylvania

---

7. In this case, I am not aware of any suit brought by the preferred shareholders. The allegations in the amended complaint indicate that their claims had no value as of December 2003 because the claims of the creditors, as of December 2003, exceeded the value of the assets of the corporation.

8. Also, under settled principles of tort law, a remote party cannot

case law, the only persons who may bring a legal malpractice action (subject to exceptions not applicable to this litigation - see supra n. 4) are clients. *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 570 (Pa. Super. 2007). See, e.g., *Smith v. Griffiths*, 476 A.2d 22, 26 (Pa. Super. 1984), where the court dismissed a legal malpractice action brought by the husband against his former wife's attorney because of the absence of an attorney-client relationship. Also see *Hess v. Fox Rothschild LLP*, 925 A.2d 798, 806 (Pa. Super. 2007) (to maintain a claim of legal malpractice, the plaintiff must show an attorney-client or analogous professional relationship with the defendant's attorney); and *Mentzer & Rhey, Inc. v. Ferrari*, 532 A.2d 484, 486 (Pa. Super. 1987) (in the absence of special circumstances, an attorney will be held liable for negligence only to his or her client).

If I reject plaintiff's contention that it was the corporation that retained K&L, plaintiff contends that I should find that an implied attorney-client relationship existed between the corporation and K&L. Under Pennsylvania law an implied attorney-client relationship exists, absent an express contract, where (1) the purported client seeks advice or assistance from the attorney; (2) the advice is within the attorney's professional competence; (3) the attorney expressly or implicitly agrees to render such assistance; and (4) the putative client reasonably believes the attorney was representing it. *Cost v. Cost*, 677 A.2d 1250, 1254 (Pa. Super. 1996).

However, there was no implied attorney-client

---

recover economic losses caused by another's negligence. *Aikens v. Baltimore and Ohio Railroad Co.*, 501 A.2d 277 (Pa. Super. 1985).

relationship between K&L and the corporation because the engagement letter is an express contract. In addition, the investigation was not conducted to protect Podlucky's interests. It is conducted solely to protect the interests of the remaining equity holders. Podlucky did not reasonably believe that K&L was also representing his interests, which were in concealing his mismanagement of the company.[9] Since K&L was instructed by the investors to determine whether the other equity holder was looting the company, the investors would have reasonably believed that the law firm was representing their interests, and only these interests, in investigating whether there was merit to concerns of mismanagement on the part of Podlucky.

In summary, the trustee is not bringing this lawsuit on behalf of the investors whom K&L was retained to protect. It is these investors to whom K&L owed a duty of care and it is these investors who have a cause of action for legal malpractice.

### 2. *NO LOSSES*

My second reason for dismissing count I is the absence of any losses to Le-Nature's caused by K&L's failure to detect mismanagement.

To prevail in a malpractice action, the plaintiff-client must establish that the failure of the defendant-attorney to exercise ordinary skill and knowledge was a proximate cause of actual damages to the plaintiff-client. *Wachovia,* supra, 935 A.2d at 570-71; and

---

9. Plaintiff's statement that K&L was representing Podlucky's interests is difficult to reconcile with the fact that during this investigation, Podlucky was represented by outside counsel (first amended complaint ¶13).

*Capital Care Corp. v. Hunt,* 847 A.2d 75, 82 (Pa. Super. 2004). In *Kituskie v. Corbman,* 525 Pa. 275, 282, 714 A.2d 1027, 1030 (Pa. 1998), the Pennsylvania Supreme Court set aside a verdict in favor of the former client based on its ruling that collectibility of the judgment in the underlying case is a matter which should be considered in a legal malpractice case. It based its ruling on the principle that "the plaintiff in a legal malpractice action should only be compensated for his actual losses." *Id.*

Even if I assume that K&L's duty of care extended to each of the owners, including the looter, plaintiff must still describe losses which the corporation experienced from K&L's failure to detect Podlucky's mismanagement. Plaintiff has alleged that the corporation was insolvent when the report was prepared in December 2003, but because the mismanagement was not discovered until December 2006, the corporation became much more insolvent. See ¶94 of plaintiff's amended complaint in which plaintiff alleges:

94. If defendants had conducted a proper investigation and had issued an appropriate report during the second half of 2003, Le-Nature's would have avoided Podlucky's massive looting of the company and the several financings and leasing obligations misused by Podlucky and the other Insiders. Had they discharged their duties and obligations properly, defendants would have informed the independent directors of the widespread fraud at the company and the independent directors would have sought immediate judicial intervention and obtained in late 2003 or early 2004,

the restraining and other orders secured in 2006. Such actions clearly would have prevented the unnecessary financings and closed down the company, which would have liquidated a failed enterprise and preserved significant asset value.

While plaintiff contends that the increased insolvency is an actual corporate loss, plaintiff does not offer any explanation as to how an already insolvent company was harmed because its insolvency increased by more than $500 million between December 2003 and October 2006. Plaintiff simply alleges that as "a direct, proximate and foreseeable result of the Law Firm defendants' wrongdoing, the company has suffered substantial damages totaling more than $500 million that the Insiders looted from the company or wasted on avoidable transactions after the issuance of the report." Amended complaint ¶107.

No Pennsylvania appellate court case law has considered whether increased insolvency constitutes a loss to the corporation. In support of his claim that the corporation (assuming that K&L's duties extended to the corporation) sustained losses measured by the difference between its indebtedness at the time of the malpractice and its indebtedness at the time the fraud was discovered, plaintiff relies on case law of other jurisdictions which have considered similar claims measuring losses in this fashion.

However, before I discuss the case law of other jurisdictions considering deepening insolvency, I will explain why I am not considering claims of creditors or shareholders in discussing whether the corporation experienced any losses as a result of K&L's failure to

detect mismanagement in December 2003.

Settled case law provides that a trustee has no standing to pursue the direct claims of creditors. *Caplin v. Marine Midland Grace Trust Co. of New York*, 92 S.Ct. 1678 (1972); *Trenwick America Litigation Trust v. Ernst & Young*, 906 A.2d 168 (Del. Ch. 2006), aff'd 931 A.2d 438 (Del. 2007). This means, for example, that claims of a creditor based on §552 of the Restatement (Second) of Torts (which requires a showing that the creditor was aware of and relied on the K&L report) would belong to and must be raised by the creditor.[10]

This litigation does not address the interests of the shareholders because their claims must be raised through actions which they institute. Furthermore, even if the trustee could sue for harm that shareholders experienced as a result of increased insolvency, in this case the shareholders were not harmed by the increased insolvency. Their interests had no value as of the date K&L submitted its report. See ¶94 of the amended complaint at page 15 of this opinion.

While no Pennsylvania appellate courts have used this terminology, there is considerable case law in other jurisdictions that have addressed trustees' (or receivers') claims of "deepening insolvency." Some trustees have referred to their deepening insolvency claim as a separate cause of action.

Others have referred to the claim as a theory of

---

10. In ruling that a trustee may not raise claims of a creditor, the *Caplin* opinion stated that the creditor should be permitted to make its own assessment of the respective advantages and disadvantages not only of litigation, but also of the various theories of litigation. 92 S.Ct. at 1687.

damages. Regardless of whether deepening insolvency is characterized as a separate cause of action or only as a theory of damages, it appears to be the position of trustees that if they show that a person, through fraud or negligence, has been responsible for prolonging the life of an insolvent corporation, this corporation is entitled to recover from this person the full amount of the increased insolvency.

As I previously stated, under Pennsylvania law, in a legal malpractice action the attorney is liable only for actual losses that the client sustained. Thus, even assuming that K&L represented the corporation and that its actions prolonged the corporation's life, the initial question I ask in considering the "deepening insolvency" case law, upon which plaintiff relies, is "how is a corporation that is already too insolvent to survive at the time of the malpractice harmed by becoming more insolvent?"

Plaintiff addressed K&L's contention that plaintiff has not described a legally cognizable injury in plaintiff's brief at 43-47. In his brief, plaintiff states that the bankrupt corporation suffered more than $500 million in damages in the form of increased liabilities and losses and looting of corporate funds and that "there can be no dispute that, under Pennsylvania law, professionals and other defendants can be held liable for increased corporate liabilities proximately caused by their negligence and other wrongdoing." *Id.* at 43. However, the only case law that the trustee cites in support of his position that the company may recover from K&L the full amount of increased liabilities and losses and looting of corporate funds are several opinions of the United States Court of Appeals for the Third Circuit, two decisions of the Federal

District Court for the Western District of Pennsylvania in which the judges based their rulings on the opinions of the court of appeals for the Third Circuit, and an unreported memorandum opinion of a single judge in proceedings in the Commonwealth Court.

Since plaintiff, in lieu of offering any explanations as to how increased insolvency constitutes harm to an already insolvent corporation, describes cases that will, according to plaintiff, support his position, I will now consider the case law upon which plaintiff relies. In considering this case law, I am not attempting to determine whether this case law supports plaintiff's position but rather whether this case law furnishes a satisfactory explanation for treating the increased amount of insolvency as a measure of actual harm that the corporation experienced. In other words, if the case law which plaintiff cites does not offer a satisfactory explanation for treating increased insolvency as a measure of an injury to the corporation, I will not follow the case law because it is inconsistent with Pennsylvania case law which provides that the plaintiff in a legal malpractice action may recover only actual losses.

Between 2001 and 2010, the court of appeals for the Third Circuit has considered deepening insolvency claims of trustees or receivers of corporations looted through Ponzi schemes in four cases. My discussion of these cases goes from the earliest to the latest.

In *Special Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340 (3d Cir. 2001), two lease-financing corporations, which were operated as a Ponzi scheme by the sole shareholder, filed for bankruptcy. The committee of creditors appointed by the bankruptcy

trustee brought claims against several parties, including an independent underwriter (Lafferty). Lafferty sought dismissal on the ground that the corporations did not experience any losses from Lafferty's actions because the corporations were already insolvent at the time of his misconduct.

This litigation was governed by Pennsylvania law. The court concluded that the Pennsylvania Supreme Court would permit recovery of damages under a theory of deepening insolvency. This was characterized as a separate cause of action.

While the court appeared to state that the measure of damages is the amount of the deepening insolvency, it offered the following explanation in support of its position that the theory is essentially sound:[11]

Under federal bankruptcy law, insolvency is a financial condition in which a corporation's debts exceed the fair market value of its assets. 11 U.S.C. § 101(32). Even when a corporation is insolvent, its corporate property may have value. The fraudulent and concealed incurrence of debt can damage that value in several ways. For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. See Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance*, 487 (5th ed. 1996) ("[B]y issuing risky debt, [a corporation] give[s] lawyers and the

11. It was unnecessary for the court to address the plaintiff's deepening insolvency claims because the court affirmed the lower court's dismissal of the lawsuit under the in pari delicto doctrine.

court system a claim on the firm if it defaults."). When brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner. See *Id.* at 488-89. Aside from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees. The very threat of bankruptcy, brought about through fraudulent debt, can shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties. See Michael S. Knoll, "Taxing Prometheus: How the Corporate Interest Deduction Discourages Innovation and Risk-Taking," 38 *Vill. L.Rev.* 1461, 1479-80 (1993). In addition, prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets.

These harms can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt. 267 F.3d at 349-50.

In the case of *In re CitX Corporation, Inc.*, 448 F.3d 672 (3d Cir. 2006), an insolvent Internet company involved in a Ponzi scheme used financial statements compiled by an accounting firm to attract investors. After the company spent the investors' money and incurred millions of dollars more in debt, it filed for bankruptcy. The bankruptcy trustee sued the accounting firm for, inter alia, malpractice and deepening insolvency.

The court ruled that the trial court had correctly

granted summary judgment as to the trustee's deepening insolvency cause of action. The trustee had raised only a negligence action against the accountant. The court, while stating that only a court en banc could overrule *Lafferty's* interpretation of Pennsylvania law as approving an economic tort of deepening insolvency for fraudulent conduct, ruled that *Lafferty* applies only to fraudulent conduct and that a claim of negligence cannot sustain a deepening insolvency cause of action.[12] *Id.* at 680-81.

The court next considered whether deepening solvency is a viable theory of damages for negligence. It stated that while the court in *Lafferty* concluded that deepening insolvency was a valid Pennsylvania cause of action, it never held that deepening insolvency was a valid theory of damages for an independent cause of action. Any statements in *Lafferty* "should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice." Id. at 677.

In 2008 in *Thabault v. Chait*, 541 F.3d 512 (3d Cir. 2008) (which applied New Jersey law), the Commissioner of Insurance of Vermont, serving as a receiver of Ambassador Insurance, brought a professional malpractice claim against an accounting firm, alleging that it failed to disclose the insolvency of Ambassador. According to the court, the commissioner presented a traditional malpractice claim, proving to the jury that but for the accountant's negligence, Ambassador would not have continued to write insurance policies. The jury awarded damages based on the losses incurred from writing

___
12. The court also stated that nothing that was said in *Lafferty* compels any extension of the doctrine beyond cases governed by Pennsylvania law. *Id.* at 680-81.

new business that Ambassador would have been prevented from writing if a proper auditing report had been submitted:[13]

> According to PwC, this amount represents an increase in the liabilities of the Estate and a loss to Ambassador's policyholders, not a distinct injury to Ambassador. Further, the unpaid portion on these claims is an increase in the liabilities of Ambassador and a loss to policyholders. Today we hold that an increase in liabilities is a harm to the company and the law provides a remedy when a plaintiff proves a negligence cause of action.

> Under the facts of this case, we are satisfied that a jury could properly hold PwC liable for damages under traditional negligence and malpractice principles. Accepting PwC's invitation to prevent a plaintiff from recovering damages in a negligence action where there has been reference to deepening insolvency, would require us to ignore well-settled New Jersey tort law doctrine, which we are not inclined to do. We hold that traditional damages, stemming from actual harm of a defendant's negligence, do not become invalid merely because they have the effect of increasing a corporation's insolvency. *Id.* at 523.

In 2010 in *Marion v. TDI Inc.*, 591 F.3d 137 (3d Cir.

---

13. In an insurance setting, policyholders are not in a position to investigate the solvency of insurance companies. They rely on a state department of insurance to protect their interests in this heavily regulated industry. Consequently, if an auditor misleads the insurance department, thereby causing harm to policyholders, the law should allow the Insurance Commissioner to act on behalf of policyholders. This would appear to be the basis for the ruling in *Thabault* that recovery was permitted under well-settled New Jersey tort law doctrine.

2010), the court of appeals for the Third Circuit again considered a complaint based on new money invested in a Ponzi scheme after the date of the alleged misconduct. The trial court affirmed the jury's award which corresponded to the sums owed on new money invested in the scheme after the date of the alleged wrongdoing. The court of appeals reversed. The only portion of the opinion that sheds any light on "deepening insolvency" was a ruling that liability cannot be imposed on a party for increasing short-term liquidity. *Id.* at 150.

I now consider the two opinions of the United States District Court for the Western District of Pennsylvania which plaintiff cites.

In the *Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. Price Waterhouse Coopers, LLP*, No. 2:00 cv 684, 2007 WL 141059 (W.D. Pa., 2007), the defendant accounting firm or its predecessors provided accounting and auditing services to Allegheny Health, Education and Research Foundation ("AHERF"). On July 21, 1998, AHERF filed for bankruptcy under chapter 11. The Committee of Unsecured Creditors contended that the accountant violated numerous core auditing standards which caused AHERF's statements of operations and balance sheets for the fiscal years 1996 and 1997 to be materially misstated. The court granted the accounting firm's motion for summary judgment under the doctrine of in pari delicto. The opinion briefly addressed the accounting firm's claim for summary judgment, based on the *In re CitX* holding that deepening insolvency is not a separate cause of action. The court stated:

In the instant action, the Committee alleges "independent caus[es] of action" in the form of professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty, which, if viable, give AHERF a "remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits." Therefore, PwC is not entitled to summary judgment based upon the holding in *CitX*. *Id.* at 7.

In the case of *In re Le-Nature's Inc. v. Wachovia Capital Markets LLC*, No. 2:09-mc-00162, 2009 WL 3571331 (W.D. Pa. 2009), Le-Nature's trustee sued third parties (Krones) that assisted Podlucky in obtaining loans which prolonged Le-Nature's life, thereby enabling Podlucky to dissipate more assets and increase corporate debt.

Krones sought dismissal on the ground that the court of appeals for the Third Circuit no longer recognizes deepening insolvency as a basis for awarding a trustee the amount of the increased insolvency. The court stated that the trustee is not seeking deepening insolvency damages for any of his claims and that he is not asserting an independent deepening insolvency cause of action.

First, Kirschner clearly states in his opposition brief that his complaint does not assert an independent "deepening insolvency" claim, and based on my review of the complaint, I concur. Indeed, the term "deepening insolvency" does not appear anywhere in the complaint. In addition, Kirschner states in his opposition brief that he is not seeking deepening insolvency damages for any of his claims. Moreover, as explained above, *CitX* does not preclude an otherwise available recovery where a complaint asserts a cause of action that provides for

a remedy for increased liabilities, decreased fair asset value, or lost profits. 448 F.3d at 678. To the contrary, if available under applicable law, damages for an increase in a corporation's liabilities, decrease in its fair asset value, or lost profits, all remain available regardless of the impact on the solvency calculation.

Plaintiff also relies on a single-judge unreported memorandum opinion entered in *Ario v. Deloitte & Touche LLP*, No. 734 M.D. 2002, 2008 W.L. 6626953 (Pa. Cmwlth. 2008). Under §65.37 of the Internal Operating Procedures of the Pennsylvania Superior Court and §414 of the Internal Operating Procedures of the Commonwealth Court, unreported opinions may not be cited or considered.[14] Thus, the opinion of this court does not consider that memorandum opinion.

I am not sure where the Third Circuit/Western District of Pennsylvania case law stands. Possibly, the trustee may now recover the amount of the increased insolvency if the trustee - rather than talking about deepening insolvency - uses the magic words that traditional principles of tort law provide a remedy to a corporation for the increase in its indebtedness. However, as I previously stated, my issue is not how plaintiff would fare under the case law upon which plaintiff relies but, rather, whether this case law offers any explanation as to how an already insolvent corporation with no hope of survival is damaged by additional debt. This case law offers no explanation.

I find to be very persuasive — and believe that the Pennsylvania appellate courts will also do so — the

---

14. Also §414 provides that a single-judge opinion, even if reported, shall be cited only for its persuasive value, not as a binding precedent.

opinion of the Court of Chancery of Delaware, New Castle County, in *Trenwick America Litigation Trust*, supra, 906 A.2d 168, aff'd 931 A.2d 438 (Del. 2007), that rejected the concept of deepening insolvency.

The court began its discussion of the claims of the litigation trust that the corporation's officers and directors, by prolonging the life of the corporation, are liable for the corporation's increased insolvency by stating:

> The concept of deepening insolvency has been discussed at length in federal jurisprudence, perhaps because the term has the kind of stentorious academic ring that tends to dull the mind to the concept's ultimate emptiness. 906 A.2d at 204.

In its rejection of deepening insolvency, the court stated:

> Moreover, the fact of insolvency does not render the concept of "deepening insolvency" a more logical one than the concept of "shallowing profitability." That is, the mere fact that a business in the red gets redder when a business decision goes wrong and a business in the black gets paler does not explain why the law should recognize an independent cause of action based on the decline in enterprise value in the crimson setting and not in the darker one. If in either setting the directors remain responsible to exercise their business judgment considering the company's business context, then the appropriate tool to examine the conduct of the directors is the traditional fiduciary duty ruler. No doubt the fact of insolvency might weigh heavily in a court's analysis of, for example, whether the board acted with fidelity and care in deciding to undertake more debt to continue

the company's operations, but that is the proper role of insolvency, to act as an important contextual fact in the fiduciary duty metric. In that context, our law already requires the directors of an insolvent corporation to consider, as fiduciaries, the interests of the corporation's creditors who, by definition, are owed more than the corporation has the wallet to repay.[15]

In this case, the Litigation Trust has not stated a viable claim for breach of fiduciary duty. It may not escape that failure by seeking to have this court recognize a loose phrase as a cause of action under our law, when that recognition would be inconsistent with the principles shaping our state's corporate law. In so ruling, I reach a result consistent with a growing body of federal jurisprudence, which has recognized that those federal courts that became infatuated with the concept did not look closely enough at the object of their ardor. *Id.* at 205-06 (footnotes omitted).

At footnote 105, the *Trenwick* opinion (*Id.* at 206-07 n. 105) cited Sabin Willett, *"The Shallows of Deepening Insolvency"*, 60 Bus. Law 549 (2005), as providing detailed reasons not to recognize deepening insolvency as a cause of action.[16]

In the opening paragraph of this article, the author states: "Whether deepening insolvency is a cause of action or merely a damage theory remains a little murky, but the notion that a firm sustains harm when its insolvency deepens now goes unchallenged by all save heretics and

---

15. Under Delaware case law when a company has reached the point of insolvency, the corporation's directors are said to owe fiduciary duties to the company's creditors. *Id.* at 205 n. 104.

16. Westlaw refers to 24 decisions citing this article.

cranks." *Id.* at 549. In the second paragraph, he states that the phrase "deepening insolvency" seems to have evolved from dictum in a 1983 decision of the United States Court of Appeals for the Seventh Circuit (*Schacht v. Brown*, 711 F.2d 1343,1350 (7th Cir. 1983)), where the court rejected a defense "with a ringing phrase: '[T]he corporate body is ineluctably damaged by the deepening of its insolvency.'" Willet, supra, at 550 (footnote omitted).

Beginning at page 561, the article addresses whether deepening insolvency is a form of corporate harm at all. The author begins by considering the constituencies who might claim an injury as the firm's insolvency deepens: equity holders, discrete claims of creditors, and claims of the corporation.[17]

With respect to shareholders, the author states that because we are exploring deepening insolvency, the corporation is insolvent at the start of the analysis. This means that the interests of the equity holders have already been wiped out before the wrongdoing occurred.

With respect to discrete claims of creditors, the article states that when a corporation is insolvent, creditors may be injured by additional debt. If the sale of a corporation's assets will generate a 50 percent distribution for holders of claims today, at least some of the creditors will be harmed if the asset values deteriorate tomorrow. However, creditors are not the corporation; that they may suffer harm as a corporation's insolvency deepens does not mean that the corporation does. The author cites the Supreme Court ruling in *Caplin*, supra, that a trustee may not bring claims

---

17. I am not aware of any case law that includes employees as constituencies of a corporation.

of individual creditors. Bus. Law at 562.

With respect to claims of the corporation, the article recognizes that the corporation is a legal person that enjoys benefits and sustains harm. Thus, the issue is whether an insolvent corporation is itself harmed if it becomes more insolvent.

The author begins with the statement of the Seventh Circuit that is the genesis of the notion that a corporation is harmed by deepening insolvency: "The corporate body is ineluctably damaged by the deepening of its insolvency." The author describes ineluctably as "one of those magic ministerial adverbs - useful for ipse dixits where analysis is wanting." *Id.* at 563. He states that in attempting to determine whether there is harm, "one must look beyond adverbs to the nouns and verbs of economics. The slate is remarkably clean." *Id.*

The article describes *Lafferty* as perhaps the leading decision on the issue of deepening insolvency. *Lafferty* identified four possible harms to the corporation (see pages 19-20 of this opinion): the first harm — increased debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation and creating operational limits which hurt a corporation's ability to run its business in a profitable manner; the second harm — deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees; the threat of bankruptcy can shake the confidence of parties dealing with the corporation; the third harm — prolonging an insolvent corporation's life may cause the dissipation of corporate assets; and the fourth harm — delayed disclosure harms

shareholders who might lose their right to dissolve the corporation in order to cut their losses. *Lafferty*, supra, 267 F.3d at 349-50.

As to the first harm, the writer states that it will be the plaintiff's burden to show the debtor could have avoided chapter 11 had its insolvency not increased and to show that the company would have fared better outside of insolvency. Willet, supra, at 565.

As to the second harm, the author states that *Lafferty* had it backwards. It is not the threat of bankruptcy that shakes the confidence of vendors, suppliers, and others. It is the company's insolvency that is straining these relationships. The essence of the deepening insolvency complaint is that the defendant wrongfully prolonged life through a scheme to cover up its true financial condition. This would have improved the debtor's reputation. *Id.* at 565-66.

The third harm — that the company is harmed because it did not file for bankruptcy soon enough — is characterized by the author as a somersault. The author recognizes that there can be harm in a narrow range of cases where more assets would have been available to creditors through an earlier liquidation. However, the author states that this harm is to the beneficiaries of that liquidation — the creditors. "The corporation is no more one of them than the deceased is a beneficiary at the reading of his will." *Id.* at 566.

The fourth theory of harm fails because, as I previously stated, the shareholders had no equity at the time of the original insolvency.

The allegations in the amended complaint that the company would have been liquidated if K&L had uncovered the mismanagement (¶94 of the amended complaint set forth at page 15 of this opinion) eliminate any claims based on the first, second, and fourth harms. With respect to the third harm, the amended complaint does not raise any claims for losses to creditors, owed money in December 2003, as a result of less assets being available to these creditors at liquidation. Thus, I need not decide whether this is a viable claim and if so, whether the trustee may bring this claim.

Both *Trenwick* and "Shallows of Deepening Insolvency" were relied on in the opinion of Judge Posner in *Fehribach v. Ernst & Young LLP*, 493 F.3d 905 (7th Cir. 2007). In that case, the trustee's claim was based on allegations that if the accounting firm had prepared an accurate audit report, the managers of the company would have realized that the company had no future and would have immediately liquidated, averting costs of $3 million the company incurred as a result of its continued operation. The court stated that this claim was based on a theory of deepening insolvency. "As originally formulated, the theory was premised on the notion that borrowing after a company becomes insolvent would 'ineluctably' hurt the shareholders. *Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983). That was a puzzling suggestion because by hypothesis a company harmed by deepening insolvency was insolvent before the borrowing spree, so what had the shareholders to lose?" 493 F.3d at 908.

*Fehribach* recognized two situations in which the shareholders would have claims: (1) upon a showing that

the corporation, while insolvent in the sense of being unable to pay its bills, would be worth more liquidated than the sum of its liabilities, and (2) if provided an earlier disclosure of the insolvency, the corporation would have been able to survive in a reorganized form. Neither situation was present in *Fehribach*. The shareholders lost their entire investment when the company became insolvent so they had nothing to lose from the increased insolvency. The only possible losers were the corporation's creditors. The court indicated that, depending on state law, the trustee might have been able to sue for the amount of the reduced liquidation value of the corporation.

*In re Greater Southeast Community Hospital Corp. I v. Tuft*, 353 B.R. 324 (Bankr. D.D.C. District of Columbia 2006), is one of the few cases that accepted the concept of deepening insolvency as a valuable theory of damages while rejecting the trustee's claim that the amount of the increased insolvency is the measure of damages:

Alberts seeks to recover for "the increased amount of insolvency suffered by the [d]ebtors" (Compl. ¶370). This calculation might have represented a fair valuation of the harm caused to the creditors of DCHC (assuming that the debt was never repaid), but Alberts has no standing to protect creditors' interests. Instead, he will need to prove that DCHC and its subsidiary corporations were actually harmed by the defendants' allegedly excessive borrowing habits, and then quantify that harm. The damages arising from these injuries (if proven) may be larger or smaller than the amount of excess debt acquired by the debtors, but they will almost certainly not be the same. *Id.* at 338 (footnotes

omitted).

Because of its ruling that increased insolvency is not a measure of damages, the court required the bankrupt corporation and its subsidiary corporations to prove that they were "actually harmed by defendants' allegedly excessive borrowing habits and then quantify that harm." At footnote 12, the court described what the trustee will need to show:

> Put another way, Alberts will need to quantify the impact of the debt accumulated by the debtors due to the defendants' actions on the debtors' business operations, not the amount of debt incurred. Specifically, he will need to show that the debtors' chances of falling into bankruptcy increased due to the defendants' actions (and then quantify the costs of bankruptcy for the debtors), that the defendants' conduct prevented the debtors from performing in a profitable manner (and then quantify the cost to the debtors caused by that impairment), or that the defendants' actions forced the debtors to dissipate corporate assets that would have been retained otherwise (and then quantify the value of those assets). As the court noted in *Latin Investment*, these calculations "pose serious problems" for a plaintiff like Alberts, 168 B.R. at 5, "but should not in [themselves] affect the decision as to dismissal. *Id.*" 353 B.R. at 338 n. 12.

At footnote 13, the court said that if the evidence shows that the debtors would have failed even without the massive borrowing, the trustee may not be able to recover anything at all. *Id.*

In summary, what a rule achieves that uses increased insolvency as the measure of damages to the corporation from the failure of a law firm to discover mismanagement is to require the law firm to make payments to the corporation in an amount that will fully reimburse those post-2003 vendors and service providers left holding the bag when the Ponzi scheme collapsed.[18] Since this is what the rule achieves, this must be the purpose of the rule. However, not a single case of which I am aware has defended the rule on the ground that this is a purpose that the law should achieve.

Even assuming that it was the corporation that retained K&L, future creditors who had been duped were not constituents of the corporate body that K&L was representing. Except for a "but for" test that has never been the law of Pennsylvania, there is no link between the report of the law firm and the losses of those new creditors left holding the bag. The report of the law firm did not influence their decisions to lend or to provide services to Le-Nature's. They did not in any way rely on the report in making their decisions because they were not aware of the report and, in fact, did not even know of the investigation. Consequently, the losses of the new creditors were not caused by K&L's malpractice.

---

18. However, the case law does not describe who would be the beneficiaries of a payment to the corporation in the amount of the increased insolvency. Example: At the date of the report, the corporation has assets of $1 million and liabilities of $10 million. At the date the mismanagement is discovered, the corporation has no assets and indebtedness of $20 million. Under this scenario, the existing creditors have been injured in an amount of $1 million. If the new creditors were bringing their own action, they would seek the remaining $9 million. I question whether the corporation would divide the $10 million payment in this fashion.

In addition, there is no privity between the law firm and persons who had no connection with the corporation on the date the report was prepared (e.g., new creditors). Where there is no privity, under established law, the law firm can be liable only in limited situations upon a showing of reliance on the law firm's report. See Restatement (Second) of Torts §552.

For these reasons, I am dismissing plaintiff's professional negligence count.

### B. *COUNT II*

Count II is a breach of contract claim based on allegations that through the engagement letter K&L formed an attorney-client relationship with Le-Nature's through which K&L agreed to assist the special committee. The facts do not support the claim that Le-Nature's hired K&L to assist the special committee.[19]

K&L's contract was with the special committee composed of the directors representing the interests of the holders of the preferred stock. There are no other interests that K&L would have been reasonably expected to protect. Since the members of the special committee had no interest in retaining counsel to protect any interests other than the interests of the holders of the preferred stock and since it would have been obvious to the law firm that its responsibilities were only to protect the interests

---

19. In his reply to brief of defendants Pascarella & Wiker LLP and Carl A. Wiker in opposition to plaintiff's preliminary objections to defendants' preliminary objections (plaintiff's reply brief) at 10, plaintiff states: "The Independent Directors took affirmative steps to determine if fraud existed, and thus hired K&L Gates and P&W to ferret out any wrongdoing."

of the preferred shareholders (i.e., not the interests of the other equity holder), under basic contract principles, K&L is liable only to the entities whose interests it was retained to protect.

Where the writing does not expressly provide that a third party is a beneficiary, under §302 of the Restatement (Second) of Contracts (1979), a third party is a beneficiary of a promise only if recognition of a right of performance in the beneficiary is appropriate to effectuate the intention of the parties and the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. See *Burks v. Federal Insurance Co.*, 883 A.2d 1086, 1087-89 (Pa. Super. 2005); *Scarpitti v. Weborg*, 530 Pa. 366, 371, 609 A.2d 147, 150 (Pa. 1992). For the reasons set forth in the above paragraph, the allegations in plaintiff's first amended complaint cannot support a finding that the parties to the contract (K&L and the special committee) intended for Le-Nature's to have a right of performance or that the circumstances indicated that K&L intended to give Le-Nature's the benefit of the promised performance.

Also, for the reasons given in my discussion of count I, the amended complaint does not describe any harm that the corporation suffered as a result of K&L's breach of a duty to exercise reasonable care.

### C. *COUNT III*

Count III is a breach of fiduciary duty claim against K&L. I am dismissing this count for the following reasons:

First, in the absence of double dealing (which is not

pled), a law firm's duties to its clients are governed only by contract and tort law.

Second, for the reasons previously stated, any fiduciary duty which the law firm owed was owed only to the members of the special committee and to the three holders of the preferred stock.

Third, for the reasons stated in my discussion of count I, the amended complaint does not describe any harm that the corporation suffered as a result of any breach of fiduciary duty.

### D. COUNT IV

Count IV is a negligent misrepresentation claim raised against both K&L and Pascarella. At this time, I consider only the claim raised against K&L. Under Pennsylvania law, the elements which must be proven for such a wrong to be shown are: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. *Gibbs v. Ernst*, 538 Pa. 193, 210, 647 A.2d 882, 890 (Pa. 1994).

Plaintiff alleges that K&L knew that its report would be provided to the special committee and to the entire board of directors and that the company, its board of directors, and the special committee justifiably relied on the misrepresentations within the report. As a result of

the misrepresentations, the independent directors did not discover and could not have reasonably discovered the fraud until the 2006 investigation.

I am dismissing this count for several reasons.

First, the misrepresentations were not relied on by the Podlucky directors — they either knew of, or did not want to know of, the mismanagement. The only persons who relied on the misrepresentations were the clients of K&L, namely the members of the special committee and those investors whom they represented. Plaintiff states that "the Insiders were not the sole officers, directors and shareholders of the company. Rather, Le-Nature's had three independent directors and minority shareholders who were not informed of the wrongdoing, did not participate in the wrongdoing, would have stopped the wrongdoing if they had known about it, did not reasonably discover the fraud until November, 2006...." Plaintiff's reply brief at 10.

Second, K&L did not intend for any persons, other than the members of the special committee and the investors that they represented, to act on its representations regarding evidence of mismanagement.

Third, it is far from clear that a person who cannot pursue a malpractice action against an attorney may expand the scope of a lawyer's responsibilities through a negligent misrepresentation claim.

Fourth, for the reasons given in my discussion of count I, the amended complaint does not describe any harm that the corporation suffered as a result of K&L's breach of a duty to exercise reasonable care.

## E. *VICARIOUS LIABILITY/RESPONDEAT SUPERIOR*

Plaintiff contends that the employees of Pascarella were agents and/or servants of K&L for whom K&L is legally responsible under the doctrine of vicarious liability.

It does not matter whether or not K&L is responsible for the conduct of Pascarella because of my rulings that K&L owed obligations only to the members of the special committee and the persons whose interests they represented.

Also, for the reasons given in my discussion of count I, the amended complaint does not describe any harm that the corporation suffered as a result of the breach by K&L and its agents of a duty to exercise reasonable care.

## II. PRELIMINARY OBJECTIONS OF PASCARELLA

### A. *COUNT IV-NEGLIGENT MISREPRESENTATION*

There are no allegations within the pleadings which would support a finding that Pascarella made representations to anyone other than K&L. Plaintiff's amended complaint does not allege that Pascarella signed the report, that it delivered the report to the special committee or the board, or that it made any communications to the special committee or the board regarding the accuracy of the report.

### B. *COUNT V-BREACH OF CONTRACT*

Plaintiff alleges that Pascarella signed a retention

agreement with K&L on September 12, 2003. He further alleges that pursuant to this retention agreement, Pascarella expressly acknowledged the duties it owed to Le-Nature's pursuant to its retention to assist K&L in the investigation. Furthermore, Le-Nature's paid for the services of this accounting firm.

I am dismissing plaintiff's breach of contract claim raised against Pascarella because there was no contract between Le-Nature's and Pascarella. The only contract that Pascarella executed was between Pascarella and K&L. The contract stated that Pascarella was being retained to assist K&L as a consultant to counsel and that it understood that its monthly invoices would be paid by Le-Nature's pursuant to the terms of K&L's engagement by Le-Nature's. The contract does not provide or suggest that either Pascarella or K&L intended to give the benefit of the performance to anyone other than possibly the members of the special committee and the preferred shareholders.

In addition, for the reasons given in my discussion of count I, the amended complaint does not describe any harm that the corporation suffered as a result of Pascarella's breach of a duty to exercise reasonable care.

## ORDER OF COURT

On this December 28, 2010, it is ordered that defendants' preliminary objections in the nature of a demurrer are sustained, and all counts of plaintiff's complaint are dismissed as to all defendants.